**UNITED STATES of America**

v.

**Hugh F. WHITTY, Jr. and Hugh F. Whitty, III, Defendants.**

**Crim. No. 87–00054–B.**

United States District Court, D. Maine.

May 19, 1988.

---

Thomas L. Goodwin, Asst. U.S. Atty., Augusta, Me., for plaintiff.

Harold Hamilton, Bangor, Me., N. Laurence Willey, Brewer, Me., for defendants.

## MEMORANDUM AND ORDER

CYR, Chief Judge.

Before the court are defendant Hugh F. Whitty, Jr.'s [Whitty Jr.] motion to dismiss and defendant Hugh F. Whitty, III's [Whitty III] motion to dismiss; motion to quash any subpoenas for obtaining, and to enjoin the use or obtaining, of Whitty III's financial records; and motion to suppress.

## FINDINGS OF FACT

1. The investigation of the crimes charged in this indictment began in February 1986. Specifically, on February 12, 1986, Special Agent James Sangillo of the Federal Bureau of Investigation [FBI] was assigned the case. The FBI had been contacted by a federal credit union official.

2. The initial complaint related to certain transactions at the Bangor Federal Credit Union [BFCU] and pertained to these defendants only.

3. Later, during the course of the investigation, Sangillo learned from Whitty Jr. that two other individuals had used an unposted account at BFCU to "float" checks for which sufficient funds were not available. At present the Government is not conducting a criminal investigation relating to these other individuals.

4. In February 1986, Whitty Jr. was dismissed as general manager of BFCU. Following Whitty Jr.'s dismissal, Whitty III believed that he was suspected of involvement in the alleged fraudulent scheme.

5. In or about February and April 1986, certain BFCU financial records relating to Whitty III and his business, Tiny Tot Diaper Service [Tiny Tot], were turned over to federal investigators following an audit which revealed possible wrongdoing by the defendants. There was no search warrant or subpoena, and Whitty III did not consent.

6. After analyzing Whitty III's and Tiny Tot's financial records, Sangillo suspected that Whitty III had engaged in a fraudulent scheme.

7. On April 24, 1986, in the early afternoon, Sangillo and Detective Owen Colomb of the Maine Attorney General's office drove to Tiny Tot in Veazie, Maine. They did not call in advance, nor had any law enforcement official contacted Whitty III previously in connection with the alleged fraud scheme at BFCU.

8. Sangillo and Colomb parked in the driveway of Tiny Tot, but did not block the driveway or Whitty III's vehicle. They entered the Tiny Tot building through the customer entrance. Both Sangillo and Colomb were in street clothes.

9. When Sangillo and Colomb entered the building, there was a young woman behind the service counter, and Whitty III's wife was also present. No customers were present, although Tiny Tot was open for business. Sangillo and Colomb asked to see Whitty III.

10. Whitty III promptly appeared in the customer reception area. Sangillo identified himself as an FBI agent and asked Whitty III if there was a more private area in which to talk. Whitty III determined to take the officers to the second floor.

11. As soon as he learned that they were law enforcement officials, Whitty III suspected that Sangillo and Colomb were there in connection with the alleged fraud scheme at BFCU. He himself preferred to repair to a more private place for the ensuing discussion.

12. Whitty III previously had considered contacting an attorney, upon learning some weeks earlier that his father, Whitty Jr., had been discharged by BFCU.

13. After Sangillo and Colomb identified themselves as law enforcement officials, Whitty III led Sangillo and Colomb through an open doorway, located behind the customer service counter, and up a spiral staircase to an unfinished second floor room. The staircase was not enclosed, and there was no door at the top or bottom of the stairs. The first floor was not visible from the second floor room, but sound from the first floor could be heard in the second floor room.

14. Not far from the doorway at the top of the staircase was an unopened stove crate. Whitty stopped beside the crate— roughly opposite, and facing, the staircase. Sangillo stood on the side of the crate to the left of Whitty III, and Colomb stood across from Whitty III with his back to the staircase.

15. The second floor was well lighted, by sunlight and artificial light.

16. Sangillo initiated the interview by stating that he was investigating a problem at BFCU and that an audit indicated that Whitty III may have been involved in a scheme to defraud BFCU. During Sangillo's initial remarks, Sangillo showed Whitty III schedules obtained by the FBI from BFCU officials relating to activity in Whitty III's personal account and Tiny Tot's business account at BFCU between September 1983 and February 1986. The schedules reflected certain correlations between the transactions in the two accounts, by date and amount.

17. Immediately after Sangillo completed his initial remarks, Whitty III admitted his involvement in the scheme. Whitty III was hopeful that his early cooperation would be recognized by the authorities, and

he felt at the time that he wanted to get the matter behind him.

18. Within the first ten minutes of the interview, Sangillo asked whether Whitty III had an attorney. Whitty III was never given *Miranda* warnings by Sangillo or Colomb. Whitty III knew that he had the right to an attorney, but he did not request one.

19. After Whitty III admitted his involvement in the scheme, Sangillo and Colomb showed him other financial records obtained from BFCU—including bank statements pertaining to Whitty III's personal account and the Tiny Tot account— and asked him to clarify certain dollar amounts.

20. Sangillo did most of the questioning during the interview. Colomb actively questioned Whitty III only with regard to the dollar amount involved in an October 1983 transaction.

21. During the interview, Sangillo and Colomb were calm. They did not coerce or intimidate Whitty III in any way. Whitty III was neither told that he was free to go, nor that he was not free to go.

22. Sangillo, Colomb and Whitty III stood around the stove crate throughout the interview. The interview was never interrupted by any other person. There was no break in the interview, no offer by Sangillo or Colomb to take a break, and no indication by Whitty III that he wished to take a break or otherwise interrupt or suspend the interview.

23. During the interview, Whitty III appeared remorseful, and he willingly, cooperated with Sangillo and Colomb by answering all of their questions.

24. Sangillo took notes during the interview. At Sangillo's request, Whitty III reviewed the notes, but he did not sign or initial them.

25. The interview lasted between one and one and one-quarter hours.

26. The interview ended when Sangillo stated that he was going to give the information he had obtained to the United States Attorney and that it was up to Whit-

ty III what action Whitty III should take. At that point, it became apparent to Whitty III that he would not be arrested or detained at that time.

27. Whitty III had no criminal record; there were no charges against him; and he was not under arrest.

28. After the interview, Whitty III escorted Sangillo and Colomb downstairs, and he remained in the building as they left.

29. Following their departure from Tiny Tot, Sangillo and Colomb proceeded to Whitty Jr.'s home to interview him. They had not interviewed Whitty Jr. at any time prior to their interview of Whitty III.

30. The FBI conducted no further field investigation of the alleged fraud scheme after these interviews of the defendants. The defendants were not indicted until October 27, 1987.

### MOTION TO DISMISS

The defendants contend that the federal bank fraud statute, 18 U.S.C. § 1344, is an *ex post facto* law, as applied to them, because the indictment alleges criminal activity beginning in September 1983, whereas the statute did not become effective until October 12, 1984. In addition, Whitty III argues that the statute is unconstitutionally overbroad and vague; that the Government is selectively prosecuting the defendants; and that the pre-indictment delay violates Whitty III's due process rights.

#### *Ex Post Facto Clause*

The defendants argue that the indictment must be dismissed because it alleges a scheme to defraud BFCU from September 1983 to February 1986, without specifically alleging that any act in violation of 18 U.S.C. § 1344 occurred after the effective date of the statute. Consequently, the de-

fendants argue, the grand jury may have indicted them solely on the basis of activity predating the effective date of the statute.[1] The court treats the motion as a motion to dismiss the entire indictment and, alternatively, as a motion to strike those portions of the indictment which allege violations of 18 U.S.C. § 1344 occurring prior to October 12, 1984.

The *Ex Post Facto* Clause of the United States Constitution, U.S. Const., art. I, § 9, cl. 3, prohibits the enactment of

any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." ... Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.

*Weaver v. Graham*, 450 U.S. 24, 28–29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (quoting *Cummings v. Missouri*, 4 Wall. 277, 325–26, 18 L.Ed. 356 (1867)). For a law to be *ex post facto*, "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver*, 450 U.S. at 29, 101 S.Ct. at 964. *See also Breest v. Helgemoe*, 579 F.2d 95, 102 (1st Cir.), *cert. denied*, 439 U.S. 933, 99 S.Ct. 327, 58 L.Ed.2d 329 (1978).

Although the *ex post facto* clause expressly restricts only the power of Congress, "[t]he principle embodied in the clause is ... encompassed in the concept of due process and is therefore a limitation on the power of the other two branches of government as well." *United States v. Brown*, 555 F.2d 407, 419 (5th Cir.1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). Thus, a statute which does not violate the *ex post facto* clause on its face nonetheless may be enforced

---

1. In *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), which predated the enactment of 18 U.S.C. § 1344, the Supreme Court held that 18 U.S.C. § 1014 does not proscribe so-called "check kiting" schemes such as the scheme with which the Whittys are charged. Section 1014 makes it a crime to "knowingly mak[e] any false statement or report, or willfully overvalu[e] any land, property or security, for the purpose of influencing in any way the action

of [a federally-insured financial institution], upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan...." 18 U.S.C. § 1014. Congress intended to close the gap in federal law exposed in *Williams* by enacting the federal bank fraud statute, 18 U.S.C. § 1344. *See* H.Rep. No. 1030, 98th Cong., 2d Sess., at 378, *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3518.

or judicially construed in a manner violative of the *ex post facto* clause.

■ Although the indictment does not specify dates on which the defendants allegedly perpetrated the fraud on BFCU, it does state that the criminal activity occurred "[b]eginning in September, 1983 and ending in February, 1986, and at various intervals in between." An indictment which alleges activity beginning before and continuing after the effective date of the statute criminalizing the activity need not be dismissed merely because it fails to allege *specific acts* after the effective date. *See United States v. Wells Fargo Armored Service Corporation*, 587 F.2d 782, 783 (5th Cir.1979) (indictment charging conspiracy commencing before and continuing after effective date); *United States v. Campbell Hardware, Inc.*, 470 F.Supp. 430, 435 (D.Mass.1979) (same). *See also United States v. Boffa*, 688 F.2d 919, 937 (3d Cir.1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983).

■ The defendants contend that the crime proscribed by 18 U.S.C. § 1344 is distinguishable from a conspiracy, for purposes of determining whether the statute, as applied to them, violates the *ex post facto* clause. Unfortunately for the defendants, however, their attempted distinction does not withstand analysis.

Section 1344 prescribes criminal penalties for anyone who "knowingly executes, or attempts to execute, a scheme or artifice" to defraud a federally insured financial institution. 18 U.S.C. § 1344. Like conspiracy, this crime continues at least as long as the underlying scheme is being executed.[2] It is the continuing nature of such crimes as conspiracy and federal bank fraud which saves an indictment even though it alleges

a scheme which was originated before, but was executed at least in part after, the effective criminalization of the activity involved in executing the scheme. *See United States v. Baresh*, 790 F.2d 392, 404 (5th Cir.1986) ("[B]ecause conspiracy is a continuing crime, a statute increasing the penalty for a conspiracy beginning before the date of enactment but continuing afterwards does not offend the Constitution."); *United States v. Todd*, 735 F.2d 146, 150–51 (5th Cir.1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 964 (1985).

In response to Whitty III's motion for a bill of particulars, defendants have been provided with more detail as to the dates of the activities for which the Government intends to prosecute them under this indictment. Moreover, in order to show that the defendants violated section 1344 at all, the Government will have to prove, at trial, that the defendants *executed* a scheme to defraud on or after October 12, 1984. Requiring proof of illegal conduct after the effective date of the statute prevents it from running afoul of the *ex post facto* clause. *United States v. Cortez*, 757 F.2d 1204, 1207 (11th Cir.), *cert. denied*, 474 U.S. 945, 106 S.Ct. 310, 88 L.Ed.2d 287 (1985). *See also United States v. Boffa*, 688 F.2d at 937; *United States v. Brown*, 555 F.2d 407, 418–21 (5th Cir.1977) (conviction reversed where conspiracy statute was given retroactive effect in the indictment and in the jury instructions), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978).

By alleging that the defendants executed a scheme to defraud BFCU between September 1983 and February 1986—thus encompassing a substantial period of time after the effective date of the statute—the indictment charges a violation of 18 U.S.C. § 1344. The Government will be required

---

**2.** At the hearing on these motions, defense counsel suggested that 18 U.S.C. § 1344 merely prohibits "scheming" to defraud a bank, and that such scheming may terminate entirely before any execution of the scheme begins. Thus, the defendants contend that the indictment, which does not indicate when the actual "scheming" occurred, is fatally defective. Even if it were to be conceded that such "scheming" does not extend to the execution of the scheme, the language of section 1344 plainly proscribes the *execution* of a scheme to defraud, and the in-

dictment plainly alleges that the execution of the scheme occurred during the time the statute was in effect.

The more obvious difference between the crime of conspiracy, which requires more than one participant, and the criminal activity proscribed by section 1344, which contemplates that a scheme and its execution may be perpetrated by one person acting alone, appears to have no particular significance in the present analysis.

to prove at trial that the defendants executed a scheme to defraud BFCU on or after October 12, 1984.[3]

### Overbreadth and Vagueness

■ Whitty III next contends that section 1344, as applied, is unconstitutionally overbroad and vague. Whitty III essentially restates the *ex post facto* argument by arguing that the statute is overbroad because it makes "illegal a revolving loan account which was legal when established." Whitty III Memorandum in Support of Motion to Dismiss, at 4. The Government concedes, as it must, that section 1344 cannot be applied to the activities of the defendant prior to its effective date. Therefore, the statute, as applied, cannot be considered unconstitutionally overbroad.

■ Whitty III's contention that section 1344 is vague asserts a facial constitutional challenge to the statute. Whitty III contends that the terms "scheme" and "artifice" "have no core meaning that can be reasonably understood by a person of common intelligence...." Whitty III Memorandum in Support of Motion to Dismiss, at 5.

> A challenge predicated on unconstitutional vagueness implicates dual principles of due process, requiring: (1) fair notice of the line between lawful and unlawful conduct; and (2) sufficiently explicit legislative limitations on the discretion of law enforcement officials to avoid arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *United States v. Professional Air Traffic Controllers*, 678 F.2d 1, 3 (1st Cir. 1982). A statute may neither forbid nor require the doing of an act in terms so vague that persons "of common intelli-

gence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *see also Zwickler v. Koota*, 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967). A statute is unconstitutionally vague *on its face* if it is expressed in such general terms that "no standard of conduct is specified at all." *Brache v. County of Westchester*, 658 F.2d 47, 50–51 (2d Cir.1981), *quoting Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). A facial vagueness challenge can only succeed when the statute "cannot validly be applied to any conduct." *Id.* at 50.

*Bangor Baptist Church v. State*, 549 F.Supp. 1208, 1225–26 (D.Me.1982) (footnotes omitted) (emphasis in original).

Whitty III cites *United States v. Van Dyke*, 605 F.2d 220 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979), which involved a criminal prosecution under 18 U.S.C. § 1341, the federal mail fraud statute. The Sixth Circuit explained that a

> scheme to defraud ... is not defined according to a technical standard. The standard is a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." ... It is not necessary that the scheme be fraudulent on its face but the scheme must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.

605 F.2d at 225; *see also United States v. Greene*, 670 F.Supp. 337, 340–41 (M.D.Fla. 1987). Rather than demonstrating that the language "scheme to defraud" does not describe a comprehensible standard, as Whitty III suggests, *Van Dyke* makes

---

**3.** The admissibility of evidence relating to defendants' actions prior to that date is better left until trial as well. *Cf. United States v. Taggatz,* 831 F.2d 1355, 1358–60 (7th Cir.1987) (evidence of check-kiting scheme not alleged in the indictment, admissible under Fed.R.Evid. 404(b)); *United States v. Ferrara,* 458 F.2d 868, 874 (2d Cir.), (evidence of activities predating conspir-

acy statute's effective date admissible "to show the existence and purpose of the conspiracy, as well as to prove the intent and purpose of the conspirators' later acts"), *cert. denied,* 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972).

The same is true of the motion to strike reference in the indictment to the period from September 1983 through October 11, 1984.

clear that the terms that Whitty III considers too vague have well-established meaning and significance in our jurisprudence. Indeed, section 1344 has been construed frequently by the federal courts. *See, e.g., United States v. Taggatz,* 831 F.2d 1355 (7th Cir.1987); *United States v. Poliak,* 823 F.2d 371 (9th Cir.1987); *United States v. Greene,* 670 F.Supp. 337 (M.D.Fla.1987).

### Selective Prosecution

■ Whitty III next contends that the defendants are being selectively prosecuted by the Government. Testimony at the hearing established that, although BFCU's initial report to federal authorities as to possible check kiting identified only these defendants, the defendants later informed the FBI of the names of two other individuals whom the defendants believed to have been using an unposted account to float checks at BFCU. These other individuals are not now the subject of any federal criminal investigation. The record does not establish that these other individuals have not been, or will not be, investigated, or prosecuted. Yet Whitty III points to the absence of any known investigation or prosecution of these two individuals in support of his claim that the defendants have been singled out for selective prosecution because of their familial relationship.

As Whitty III concedes, a defendant bears a heavy burden in attempting to prove selective prosecution.

> Prosecutors have broad discretion in deciding whom to prosecute. Moreover, the courts should presume that the prosecution was pursued in good faith execution of the law. The prosecutor's discretion is limited by constitutional principles of equal protection and due process, which protect individuals from selective enforcement and prosecution. To overcome the presumption of good faith, a defendant must establish that his prosecution results from "intentional and purposeful discrimination."

*United States v. Bassford,* 812 F.2d 16, 19 (1st Cir.) (*footnotes omitted*), *cert. denied,* — U.S. ——, 107 S.Ct. 1909, 95 L.Ed.2d 514 (1987).

The First Circuit employs a strict standard of intentional and purposeful discrimination in testing claims of selective prosecution.

> To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie,* (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*Bassford,* 812 F.2d at 19 (*footnote omitted*). *See also Tracey v. United States,* 739 F.2d 679, 682–83 (1st Cir.1984), *cert. denied,* 469 U.S. 1109, 105 S.Ct. 787, 83 L. Ed.2d 781 (1985).

Although the Government concedes that it has not prosecuted the two other individuals who were accused by defendants of having violated section 1344, the record shows that only the defendants were identified by BFCU in their initial report to the FBI and that the defendants' alleged scheme involved more money than is alleged to have been involved in the activities of the two other individuals. Yet Whitty III speculates that he and his father were targeted for prosecution because of their familial relationship. But in view of the fact that the initial (and only) complaint to government authorities concerning such a scheme at BFCU originated with BFCU officials (not federal officials) and since there has been no showing of complicity or other improper government involvement whatever in the selection of these defendants for prosecution, this unsubstantiated contention is insufficient to overcome the presumption that the Government has exercised its prosecutorial discretion in good faith.

Whitty III has failed to introduce evidence "sufficient to raise a reasonable doubt about the prosecutor's purpose." *United States v. Falk,* 479 F.2d 616, 620–

21 (7th Cir.1973) (en banc) (*prima facie* showing of selective prosecution where evidence showed that a vocal opponent of the draft was singled out for prosecution); *see also United States v. Steele,* 461 F.2d 1148 (9th Cir.1972) (same); *United States v. Saade,* 652 F.2d 1126, 1135–36 (1st Cir. 1981) (distinguishing *Falk* and *Steele*). Accordingly, Whitty III has not made the requisite showing to entitle defendants to an evidentiary hearing on the claim of selective prosecution, let alone to establish selective prosecution. *See Bassford,* 812 F.2d at 19.

### Preindictment Delay

■ Whitty III's final contention in support of his motion to dismiss the indictment is that the one and one-half year delay between the completion of the FBI's investigation of the defendants on April 1986 and the return of the indictment on October 27, 1987, requires dismissal under Fed. R.Crim.P. 48(b). The Government neither denies that there was an 18–month delay, nor does it offer any explanation.

Federal Rule of Criminal Procedure 48(b) states:

> If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, ... the court may dismiss the indictment, information or complaint.

Rule 48(b) was intended as a "restatement of the inherent power of the court to dismiss a case for want of prosecution." Fed. R.Crim.P. 48(b) Advisory Committee note (citing *Ex parte Altman,* 34 F.Supp. 106 (S.D.Cal.1940)). Its inherent power enables the court to protect defendants' sixth amendment rights to a speedy trial in cases where the United States Attorney leaves "prosecutions hanging over their heads, like the sword of Damocles, for years, without an effort to bring them to trial." *Altman,* 34 F.Supp. at 108.

The sixth amendment right to speedy trial and the judicial power to dismiss an indictment for want of prosecution under rule 48(b) are implicated only after a formal arrest or indictment. *United States v. Lovasco,* 431 U.S. 783, 789 n. 8, 97 S.Ct. 2044, 2048 n. 8, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 319, 92 S.Ct. 455, 462, 30 L.Ed.2d 468 (1971). Where, as here, a defendant has neither been arrested nor indicted, neither rule 48(b) nor the sixth amendment right to speedy trial is implicated.

Instead, "the Due Process clause has a limited role to play in protecting against oppressive [pre-indictment] delay...." *Lovasco,* 431 U.S. at 789, 97 S.Ct. at 2048; *see also Marion,* 404 U.S. at 324, 92 S.Ct. at 465. *Lovasco* and *Marion,* like the present case, involved substantial pre-indictment delay.[4] Like the present case, *Lovasco* involved an investigation begun shortly after receipt of complaints of the alleged criminal conduct, followed by an investigative report which was never supplemented during the ensuing pre-indictment delay. *Lovasco* claimed that the delay had prejudiced him because two defense witnesses had died before the indictment was returned. Although in *Lovasco,* as in this case, the government "made no systematic effort in the District Court to explain its long delay," 431 U.S. at 786, 97 S.Ct. at 2047, in *Lovasco* the government expressly disagreed with the defendant's contention that the investigation lay dormant throughout virtually the entire period of delay. Here the Government makes no effort to explain the 18–month time lapse from the April, 1986, interviews to the return of the indictment on October 27, 1987.

"To prove that a delay violated ... 'fundamental conceptions of justice' a defendant must prove that (1) pre-indictment delay caused substantial prejudice to his right to a fair trial and, (2) the Government intentionally delayed indictment in order to gain a tactical advantage over the accused." *United States v. Picciandra,* 788 F.2d 39, 42 (1st Cir.) (citing *Marion,* 404 U.S. at 324–25, 92 S.Ct. at 465), *cert. denied,* —— U.S. ——, 107 S.Ct. 166, 93 L.Ed.2d 104 (1986); *see also United States*

---

4. *Marion* involved a delay of three years, 404 U.S. at 308, 92 S.Ct. at 457, while *Lovasco* involved an 18–month delay, 431 U.S. at 784, 97 S.Ct. at 2046.

*v. Lebron–Gonzalez,* 816 F.2d 823, 831 (1st Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987).[5]

In light of the Government's utter failure even to explain the 18–month pre-indictment delay, except for its abject admission that the prosecution of these defendants remained shelved during the entire 18–month period, the court is satisfied that the second prong of the *Picciandra* standard must be deemed to have been met. However, Whitty III's failure to allege, let alone show, actual prejudice militates conclusively against dismissal of the indictment.[6] The Supreme Court has made clear that the government is under no duty to indict a defendant immediately upon having probable cause to do so. *Lovasco,* 431 U.S. at 791, 97 S.Ct. at 2049.

## MOTION TO SUPPRESS

Whitty III moves for suppression of all evidence obtained in violation of the Right to Financial Privacy Act [RFPA], 12 U.S.C. §§ 3401, *et seq.* Second, he contends that *all* evidence must be suppressed because this prosecution violates his constitutional rights to due process and equal protection, and the *ex post facto* clause.[7] Finally, he contends that the statements he made during the April 24, 1986, interview must be suppressed because they were obtained without *Miranda* warnings, and they were involuntary.

### *Suppression Under the RFPA*

■ The RFPA prescribes narrowly-tailored procedures for the obtaining of financial institution records by the government. Title 12 United States Code, section 3402 states:

Except as provided by section 3403(c) or (d), 3413 or 3414, no Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution unless the financial records are reasonably described and—

(1) such customer has authorized such disclosure in accordance with section 3404;

(2) such financial records are disclosed in response to an administrative subpena or summons which meets the requirements of section 3405;

(3) such financial records are disclosed in response to a search warrant which meets the requirements of section 3406;

(4) such financial records are disclosed in response to a judicial subpena which meets the requirements of section 3407; or

(5) such financial records are disclosed in response to a formal written request which meets the requirements of section 3408.

The procedures for obtaining financial records by means of administrative or judicial subpoena require reason to believe that the records are relevant to a legitimate law enforcement inquiry, that detailed notice has been provided to the customer whose financial records are sought, and that the customer be given time to file a motion to quash the subpoena. *See* 12 U.S.C. §§ 3405, 3407. The government may obtain financial records by formal written request, following similar procedures, only if an administrative summons or subpoena is unavailable and the request is authorized by regulation. *See* 12 U.S.C. § 3408. To

---

5. A showing of *possible* prejudice, though sufficient to prove a violation of the sixth amendment right to speedy trial, clearly is insufficient to justify dismissal of an indictment based on pre-indictment delay. *See Marion,* 404 U.S. at 320–325, 92 S.Ct. at 463–65.

6. "Statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide 'the primary guarantee against bringing overly stale criminal charges,'" *Lovasco,* 431 U.S. at 789, 97 S.Ct. at 2048 (citation omitted), and create an irrebuttable presumption of prejudice to the defendant, *Marion,* 404

U.S. at 322, 92 S.Ct. at 464. Here the indictment was returned well within the applicable five-year statute of limitations, 18 U.S.C. § 3282, requiring Whitty III to meet the more stringent standard of impermissible pre-indictment delay as set forth in *Marion,* 404 U.S. at 324–25, 97 S.Ct. at 465.

7. This second contention is without merit in all its aspects, for the reasons stated in the foregoing discussion of the motion to dismiss. Thus, only the RFPA and *Miranda* claims merit separate discussion.

obtain financial records pursuant to a search warrant, the government must comply with the Federal Rules of Criminal Procedure. *See* 12 U.S.C. § 3406. Finally, a customer may authorize disclosure of financial records by issuing a signed statement in accordance with 12 U.S.C. § 3404.

The RFPA also restricts disclosure of financial records by financial institutions themselves. Section 3403 provides:

> **(a) Release of records by financial institutions prohibited.** No financial institution may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provisions of this title.
>
> **(b) Release of records upon certification of compliance with chapter.** A financial institution shall not release the financial records of a customer until the Government authority seeking such records certifies in writing to the financial institution that it has complied with the applicable provisions of this title.
>
> **(c) Notification to Government authority of existence of relevant information in records.** Nothing in this title shall preclude any financial institution, or any officer, employee, or agent of a financial institution, from notifying a Government authority that such institution, or officer, employee, or agent has information which may be relevant to a possible violation of any statute or regulation. Such information may include only the name or other identifying information concerning any individual or account involved in

and the nature of any suspected illegal activity. Such information may be disclosed notwithstanding any constitution, law, or regulation of any State or political subdivision thereof to the contrary. Any financial institution, or officer, employee, or agent thereof, making a disclosure of information pursuant to this subsection, shall not be liable to the customer under any law or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof, for such disclosure or for any failure to notify the customer of such disclosure.

12 U.S.C. § 3403.[8]

The Government concedes that the financial records of Whitty III and Tiny Tot were obtained without a search warrant, summons, subpoena, formal written request, or Whitty III's consent.[9] It follows that the Government could not have certified to BFCU "that it ha[d] complied with the applicable provisions of [the RFPA]," 12 U.S.C. § 3403(b), before obtaining financial records from BFCU.

The Government nonetheless contends that the version of the RFPA in effect in February and April 1986, when Whitty III's financial records were obtained, permitted BFCU to disclose these financial records, pursuant to 12 U.S.C. § 3403(c),[10] and that it was the practice of the government to require such disclosure upon receiving a complaint of wrongdoing from a financial institution. The Government relies on a

---

**8.** Prior to October 27, 1986, and at the time that the government obtained Whitty III's financial records from BFCU, 18 U.S.C. § 3403(c) provided as follows:

> Notification to Government authority of existence of relevant information in records. Nothing in this title shall preclude any financial institution, or any officer, employee, or agent of a financial institution, from notifying a Government authority that such institution, or officer, employee, or agent has information which may be relevant to a possible violation of any statute or regulation.

**9.** The Government contends that the financial records of Tiny Tot were not covered by the RFPA because Tiny Tot is a corporation. The Government is correct in arguing that the RFPA

applies only to individuals or partnerships of less than five individuals, and not to corporations. *See* 12 U.S.C. § 3401(4); *Pittsburgh National Bank v. United States,* 771 F.2d 73, 75 (3d Cir.1985); *Spa Flying Service, Inc. v. United States,* 724 F.2d 95, 96 (8th Cir.1984). However, the record contains no evidence that Tiny Tot was a corporation, and the court instead treats it as a sole proprietorship, as Whitty III contends. Unlike corporations, sole proprietorships are covered by the RFPA. *See Hunt v. Securities & Exchange Commission,* 520 F.Supp. 580, 604 (N.D.Tex.1981). Thus, both Whitty III's and Tiny Tot's records were covered by the RFPA; both are referred to collectively hereinafter as Whitty III.

**10.** *See* note 8 *supra.*

proposed Federal Deposit Insurance Corporation [FDIC] regulation, published on October 24, 1985, which, in the Government's view, would have required financial institutions to disclose financial records when reporting criminal violations of the United States Code to federal authorities. *See* Proposed Rules, 50 Fed.Reg. 43,209 (proposed Oct. 24, 1985).

In fact, however, the *proposed* rule explicitly states that "[a]ll information requested ... should be supplied at the time of the referral unless such information is not known *or can only be supplied at a later date by operation of The Right to Financial Privacy Act.*" 50 Fed.Reg. at 43,221 (emphasis added). Nonetheless, the fact that Congress considered it appropriate to clarify subsection 3403(c) by expressly restricting financial institution disclosures of criminal activity to "the name or other identifying information concerning any individual or account involved in and the nature of any suspected illegal activity," 12 U.S.C. § 3403(c), may well indicate that the government did have a good-faith practice or policy of requiring reports of criminal violations to include financial records.

Nevertheless, such a policy or practice cannot be made to comport with 12 U.S.C. § 3403(a), which establishes a blanket prohibition of disclosure of financial records, except as provided by the RFPA, or with 12 U.S.C. § 3403(b), which prohibits a financial institution from releasing financial records to the government until the government has certified that it has complied with the provisions of the RFPA. *See Donovan v. National Bank of Alaska,* 696 F.2d 678, 683 (9th Cir.1983). Both of these provisions were in effect when BFCU turned over Whitty III's financial records to the FBI.

Moreover, the earlier version of 12 U.S.C. § 3403(c) merely permitted a financial institution to notify the government that the financial institution had information relating to a possible statutory or regulatory violation, and in no way implied or stated that disclosure of financial records or other relevant information was allowed.[11] *See United States v. Frazin,* 780 F.2d 1461, 1465 n. 1 (9th Cir.) (subsection 3403(c) allows notification that a financial institution *has such information,* but not the disclosure of that information without the requisite authorization), *cert. denied,* 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986).

Accordingly, the court finds that Whitty III's financial records were obtained by the Government in violation of the RFPA.

 Whitty III contends that suppression of the illegally obtained financial records is the appropriate remedy. In *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), the Supreme Court held that customers of financial institutions have no legitimate fourth amendment expectation of privacy in their personal financial records. In response to *Miller,* Congress enacted the RFPA to extend privacy protection of such records beyond that provided by the Constitution. *United States v. Kington,* 801 F.2d 733, 737 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1888, 95 L.Ed.2d 495 (1987); *United States v. Frazin,* 780 F.2d at 1465. Because any privacy interest Whitty III had in the financial records disclosed by BFCU was protected only by statute, any remedy for the invasion of that privacy interest derives from the RFPA, not from the fourth amendment. *See Kington,* 801 F.2d at 737.

Every federal court which has addressed the issue has held that the RFPA confers no suppression remedy for government violations of the RFPA. *See United States v. Kington,* 801 F.2d at 737; *United States v. Frazin,* 780 F.2d at 1465–66; *United*

---

**11.** Of course, the proposed rule upon which the Government relies—even if it had stated that financial records themselves could be disclosed—would offer no support for the Government's position, since the proposed rule was never adopted. Moreover, given the congressional intent in enacting the RFPA—"to protect the customers of financial institutions from unwarrant-ed intrusion into their records while at the same time permitting legitimate enforcement activity," *Donovan v. National Bank of Alaska,* 696 F.2d at 683—and the RFPA's delineation of procedures which easily could have been followed by the Government in this case, the Government's strained construction of subsection 3403(c) is altogether implausible.

*States v. Lee,* 667 F.Supp. 1404, 1419 (D.Colo.1987); *United States v. Mosko,* 654 F.Supp. 402, 406 (D.Colo.1987); *United States v. Musson,* 650 F.Supp. 525, 533 (D.Colo.1986); *United States v. Grubb,* 469 F.Supp. 991, 995 n. 8 (E.D.Pa.1979). In balancing the right of privacy with the needs of law enforcement, Congress selected civil penalties as the *exclusive* remedy against the government for obtaining, and financial institutions for disclosing, financial records in contravention of RFPA procedures. *See United States v. Frazin,* 780 F.2d at 1466; 12 U.S.C. § 3417.[12] "Had Congress intended to authorize a suppression remedy, it surely would have included it among the remedies it expressly authorized." *Frazin,* 780 F.2d at 1466.[13]

Whitty III nevertheless argues that Congress evidenced its intent to permit suppression as a remedy by expressly referring to the Federal Rules of Criminal Procedure in the RFPA, *see* 12 U.S.C. § 3406(a). Subsection 3406(a) provides that "[a] Government authority may obtain financial records ... only if it obtains a search warrant pursuant to the Federal Rules of Criminal Procedure." Rule 41, which sets out the procedures for obtaining, and the formal requisites of, a search warrant, provides that "[a] motion to suppress evidence may be made ... as provided in Rule 12." Fed.R.Crim.P. 41(f). However, the reference found in subsection 3406(a) to rule 41 plainly was intended to make clear that the search warrant pursuant to which formal records could be disclosed to the government under subsection 3402(3) had to be obtained in accordance with the procedures prescribed by rule 41. And there is no suggestion, either in the language of the RFPA or in its legislative history, that any judicial remedy prescribed by some other Federal Rule of Criminal Procedure, such as rule 12, was to be imported into the RFPA for noncompliance with its nondisclosure provisions.

Furthermore, defendant reads rule 12 too expansively. Rule 12 prescribes procedures for filing pretrial motions in criminal cases. In no way does rule 12 prescribe substantive standards for determining pretrial motions. Rather, any substantive rights sought to be vindicated by a motion

---

12. Section 3417 provides in part:

 **(a) Liability of agencies or departments of United States or financial institutions.** Any agency or department of the United States or financial institution obtaining or disclosing financial records or information contained therein in violation of this title is liable to the customer to whom such records relate in an amount equal to the sum of—

 (1) $100 without regard to the volume of records involved;

 (2) any actual damages sustained by the customer as a result of the disclosure;

 (3) such punitive damages as the court may allow, where the violation is found to have been willful or intentional; and

 (4) in the case of any successful action to enforce liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

 **(b) Disciplinary action for willful or intentional violation of chapter by agents or employees of department or agency.** Whenever the court determines that any agency or department of the United States has violated any provision of this title and the court finds that the circumstances surrounding the violation raise questions of whether an officer or employee of the department or agency acted willfully or intentionally with respect to the violation, the Civil Service Commission shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the agent or employee who was primarily responsible for the violation. The Commission after investigation and consideration of the evidence submitted, shall submit its findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Commission recommends.

 **(c) Good faith defense.** Any financial institution or agent or employee thereof making a disclosure of financial records pursuant to this title in good-faith reliance upon a certificate by any Government authority shall *not* be liable to the customer for such disclosure.

 **(d) Exclusive judicial remedies and sanctions.** The remedies and sanctions described in this title shall be the only authorized judicial remedies and sanctions for violations of this title.

13. Because suppression is not a remedy under the RFPA, it has been held that it would be inappropriate for the judiciary to thwart congressional intent by suppressing financial records in the exercise of supervisory judicial powers over the administration of justice. *See United States v. Frazin,* 780 F.2d at 1466.

to suppress under rule 12 must emanate from the Constitution or from a statute. Neither the Constitution nor the RFPA offers substantive support for Whitty III's motion to suppress.

### Miranda Warnings

■ Whitty III seeks to suppress incriminating statements made during an interview by Special Agent Sangillo and Detective Colomb on the further basis that no *Miranda* warnings were given. *Miranda* warnings are required when government agents attempt to elicit statements from an individual who is "in custody at the station or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966). Even if an individual is questioned by police at home or in other familiar surroundings, *Miranda* warnings are required if the circumstances render the interrogation custodial. *See Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). An interrogation is custodial if a reasonable person in the situation of the interrogated individual would believe "not merely that he [is] not free to go, but that he [is] actually in custody and 'at the mercy of the police.'" *United States v. Streifel*, 781 F.2d 953, 961 (1st Cir.1986) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 3150, 82 L.Ed. 2d 317 (1984)). *See also United States v. Masse*, 816 F.2d 805, 809 (1st Cir.1987).

The standard is an objective one, which recognizes that, even though any confrontation with the police tends to have coercive aspects, the police are not required to administer *Miranda* warnings to everyone they question. *See Masse*, 816 F.2d at 809. "Among the factors to be considered are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Streifel*, 781 F.2d at 961 n. 13.

Applying these factors, the court concludes that Whitty III was at no time subjected to custodial interrogation. Whitty III was interviewed in his own place of business, during the day, and in a private area of his own choosing. Sangillo and Colomb neither physically restrained Whitty III nor informed him that he was not free to leave. *Contrast Moore v. Ballone*, 658 F.2d 218 (4th Cir.1981) (suppression required where defendant was picked up off the street, without probable cause, taken into a rear room at the police station, and interrogated by several officers for several hours despite his request to leave). Indeed, Whitty III was motivated to speak with the officers primarily by feelings of remorse and a desire to minimize the consequences of his illegal activities through voluntary cooperation.

The interview was not unduly extended. Moreover, the crucial admissions were made within the first few minutes of the interview. There is no allegation, much less evidence, of coercion or compulsion on the part of the officers. Instead, from the evidence it appears that a reasonable person would have realized that he was free at any time to suspend the interview and rejoin his wife in the customer area of the business premises, just as he had chosen to conduct the officers to the second floor when Sangillo asked if there was a more private place to talk.

### Voluntariness of Admissions

■ The court next considers whether the government's use, during the interview, of the financial records obtained in violation of the RFPA violated Whitty III's due process rights and whether the subsequent statements of Whitty III should be suppressed.

Incriminating statements obtained through the use of evidence secured in violation of the fourth amendment are suppressible as "fruit of the poisonous tree," unless the making of the statements was "'sufficiently an act of free will to purge the primary taint.'" *United States v. Budzyna*, 666 F.2d 666, 671 (1st Cir.1981) (quoting *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)); *see also Brown v. Illinois*, 422 U.S. 590, 601–03, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975); *Oregon v. Elstad*, 470 U.S. 298, 306, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985); W. Ringel, *Searches & Seizures, Arrests and Confessions* § 3.2(b) (2d ed. 1986). Conversely, as the

Supreme Court held in *Oregon v. Elstad*, the "fruits" of a voluntary statement made without *Miranda* warnings are admissible, unlike the fruits of an unreasonable search or illegal arrest. 470 U.S. at 308, 105 S.Ct. at 1292. Thus, further statements which were the fruits of a suppressible statement, but which were not themselves obtained in violation of the Constitution, would be admissible. The Court reasoned that, unlike an unreasonable search or illegal arrest, the failure to give *Miranda* warnings does not give rise to a constitutional violation so long as the statement obtained is nonetheless voluntary, and even though the statement itself must be suppressed. *See Elstad*, 470 U.S. at 308, 105 S.Ct. at 1292. Cases in which "there [is] no actual infringement of [a] suspect's constitutional rights [are] not controlled by the doctrine ... that fruits of a constitutional violation must be suppressed." *Id.*

Prior to Whitty III's admissions, Sangillo and Colomb showed Whitty III schedules prepared from the financial records of Whitty III's personal account and the Tiny Tot account with BFCU. These schedules, as they related to the financial records of Whitty III's personal account, clearly were obtained in violation of the RFPA.[14] But suppression of Whitty III's admissions solely to redress this violation of the RFPA would contravene constitutional law, *see Elstad*, 470 U.S. at 308, 105 S.Ct. at 1292, and the RFPA as well, *see* 12 U.S.C. § 3417.

In and of itself the use of Whitty III's records, though obtained in violation of the RFPA, did not render the admissions involuntary. "Courts are unanimous in holding that confronting the defendant with evidence of guilt is not coercive conduct on the part of the police and does not render a subsequent confession involuntary." W. Ringel, *Searches & Seizures, Arrests and Confessions* § 25.2(e) (2d ed. 1986). *See, e.g., Blackmon v. Blackledge*, 541 F.2d 1070, 1072–73 (4th Cir.1976); *United States v. Boston*, 508 F.2d 1171 (2d Cir.1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975). Moreover, under all of the circumstances there is no evidence to suggest that Whitty III's admissions were involuntary. *See Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (*per curiam* ) ("The test is whether the confession 'was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.' ") (*quoting Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897)).

## MOTION TO QUASH

Whitty III moves to "Quash and Enjoin the Government from obtaining and/or using financial records." Subsection 3410(a) provides in part:

(a) **Filing of motion to quash or application to enjoin; proper court; contents.** Within ten days of service or within fourteen days of mailing of a subpena, summons, or formal written request, a customer may file a motion to quash an administrative summons or judicial subpena, or an application to enjoin a Government authority from obtaining financial records pursuant to a formal written request, with copies served upon the Government authority. A motion to quash a judicial subpena shall be filed in the court which issued the subpena. A motion to quash an administrative summons or an application to enjoin a Government authority from obtaining records pursuant to a formal written request shall be filed in the appropriate United States district court. Such motion or application shall contain an affidavit or sworn statement—

(1) stating that the applicant is a customer of the financial institution from which financial records pertaining to him have been sought; and

(2) stating the applicant's reasons for believing that the financial records sought are not relevant to the legitimate law enforcement inquiry stated by the Government authority in its no-

---

**14.** The RFPA defines a "financial record" as "an original of, a copy of, or information known to have been derived from, any record held by a financial institution pertaining to a customer's relationship with the financial institution." 12 U.S.C. § 3401(2). The subject schedules fall within this definition.

tice, or that there has not been substantial compliance with the provisions of this title.

Since the Government has obtained the financial records to which Whitty III's motion relates, the motion is moot. Whitty III may renew the motion in response to any process or request in the future. Subsection 3410(a) does not provide a remedy against the use of records already obtained in violation of the RFPA.

For the foregoing reasons:

1. Whitty Jr.'s motion to dismiss is DENIED;

2. Whitty III's motion to dismiss is DENIED;

3. Whitty III's motion to suppress is DENIED; and

4. Whitty III's motion to quash is DENIED, without prejudice to Whitty III's right to renew the motion to quash in response to any subpoena, summons or formal written request for additional financial records of Whitty III.

SO ORDERED.