**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Alvin FRAZIN, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ronald Mark MILLER,**
**Defendant-Appellant.**

Nos. 84–5080, 84–5081.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1984.

Decided Jan. 21, 1986.

---

**1462**

Robert E. May, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Sheldon Sherman, Pancer & Sherman, Judy Clarke, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendant-appellant.

Before NELSON, BOOCHEVER, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Frazin and Miller appeal from their convictions for mail and wire fraud and for aiding and abetting under 18 U.S.C. §§ 1341 and 1343 (1982). Frazin argues that his bank records and other financial information obtained in violation of state and federal financial privacy laws should have been excluded from evidence under the court's inherent supervisory powers. Miller argues for the suppression of evidence seized from his car parked in his garage. Miller also challenges the district court's failure to give a requested jury instruction. Both appellants contend that the court's ex parte communication with the jury in their absence constituted reversible error. We affirm the convictions.

FACTS

Frazin and Miller engaged in a fraudulent advertising campaign. They placed ads in out-of-state newspapers promising

15% interest on investments in the Western Heritage Financial Trust. Frazin opened approximately 15 bank accounts at different financial institutions in the name of Western Heritage. He was the sole signatory on at least one of the accounts.

Numerous willing out-of-state investors contacted Frazin. Frazin made various misrepresentations to them about the investment scheme. He withdrew for his personal use sizeable amounts of the money wired him by investors.

In its investigation of the case, the FBI was contacted by, and in turn contacted, several banks in which Frazin had opened an account in the name of Western Heritage. The banks provided the FBI with information about those accounts without Frazin's knowledge or consent and without a warrant.

When Miller was arrested at his home in connection with the investment scheme, state law enforcement officers searched his house and garage pursuant to a warrant, seeking financial and other records. Miller's car was parked in the garage. The officers seized a looseleaf notebook in plain view on the car seat.

At trial, Miller requested an instruction that the jurors must find a scheme to defraud substantially as broad as that charged in the indictment, and that they must be unanimous as to the specific acts that they find comprised the scheme. The court gave the first part of the requested instruction, but refused to instruct on unanimity as to specific acts.

The trial lasted over five days. The jury reached no verdict on the first day of deliberations. Before releasing the jury for the evening, Judge Thompson told the jurors that he was leaving town, and that a substitute judge would take the verdict in his absence if one was reached the next day. He further instructed them to "keep your own consciences relative to this case, and that goes before you go in, all the time you're in, and after you're out." After dismissing the jury, Judge Thompson told counsel that if the jury did not reach a verdict the next day, Friday, the substitute judge would instruct the jury to continue deliberations again Monday morning. The next day at 10:30 a.m., the jury sent out a note that read: "We are deadlocked on all counts at present, and it has been indicated ... that neither side is going to change their positions. What do we do?" Because the substitute judge was out of chambers, the court staff contacted Judge Thompson by telephone about the deadlock note. He ordered that an instruction be sent to the jury that read: "Please continue your deliberations in the above entitled case." After receiving the judge's instruction, the jury deliberated for approximately three and one-half hours before returning its verdict. Neither appellants nor their counsel were informed of the judge's communication to the jury until their arrival at court for the reading of the verdict. Upon learning of the communication, appellants moved for a mistrial. Their motion was denied.

## I. *Suppression of Evidence Under Court's Supervisory Powers*

Appellant Frazin seeks to suppress bank records and other information obtained in violation of the Right to Financial Privacy Act of 1978. 12 U.S.C. §§ 3401–22 (1982 & Supp. II 1984) ("the Act"). Although the Act provides for exclusive civil penalties for its violation, Frazin argues that the district court should have exercised its "inherent supervisory powers ... to dismiss an indictment on the basis of governmental misconduct." *United States v. Owen*, 580 F.2d 365, 367 (9th Cir.1978) (citations omitted). In evaluating Frazin's claim, we consider first, whether the Act itself authorizes a suppression remedy, and second, if the Act does not authorize such a remedy, whether we may provide one in the exercise of our supervisory powers. We hold against appellant on both issues.

There is no dispute over the facts relating to the government's collection of Frazin's financial information and records. The only issue on appeal is whether the district court was correct as a matter of law in refusing to suppress the improperly obtained evidence. We review the question

*de novo. United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

■ The Right to Financial Privacy Act of 1978 prohibits financial institutions from providing the government with information concerning their customers' financial records, unless either the customer authorizes the disclosure of such information or the government obtains a valid subpoena or warrant. 12 U.S.C. § 3402.[1] Congress passed the Act in part as a response to *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). *See* H.R. Rep. No. 1383, 95th Cong., 2d Sess. 34 (1978) ["*H.R. Rep. No. 1383*"], *reprinted in* 1978 U.S.Code Cong. & Ad.News 9273, 9306; *Electronic Funds Transfer and Financial Privacy: Hearings on S. 2096, S. 2293, and S. 1460 Before the Subcomm. on Financial Institutions of the Senate Comm. on Banking, Housing, and Urban Affairs,* 95th Cong., 2d Sess. 154 (1978) (statement of Senator Mathias) ["*Senate Hearings*"]. In *United States v. Miller,* the Supreme Court affirmed a denial of a motion to suppress bank records obtained by an allegedly defective subpoena, on the ground that a bank customer has no constitutionally-protected privacy interest in such records. *Miller,* 425 U.S. at 440, 96 S.Ct. at 1622–23. The Act "fill[s] the void in ... Federal law [left by *Miller*] regarding statutory protection against unrestricted access to third-party records." *Senate Hearings* at 154; *see also The Safe Banking Act of 1977: Hearings on H.R. 9086 before* the Subcomm. on Financial Institutions Supervision, Regulation & Insurance of the House Comm. on Banking, Finance & Urban Affairs,* 95th Cong., 1st Sess. 1600 (1977) (statement of Representative Rolph) (the Act reverses *Miller* by recognizing a claim of confidentiality for bank customer records) ["*House Hearings*"].

Both Congress and the Executive regarded the Act as a compromise between a bank customer's right of financial privacy and the need of law enforcement agencies to obtain financial records pursuant to legitimate investigations. *See* H.R.Rep. No. 1383 at 34, *reprinted in* 1978 U.S.Code Cong. & Ad.News 9273, 9306; *Donovan v. National Bank,* 696 F.2d 678, 683 (9th Cir.1983). Earlier versions of the Act did not provide for penalties, but instead required the Justice Department to give a bank customer 18 days advance notice of a government subpoena, within which period the customer could move to quash the subpoena. The Justice Department opposed the advance notice provision on the ground that it would impede the Department's investigative functions. *See* Letter from Attorney General Griffin Bell to Representative Fernand J. St. Germain (Sept. 20, 1977) (discussing Justice Department response to H.R. 9086) in *House Hearings* at 1527–28; *House Hearings* at 1531–32 (statement of Deputy Assistant Attorney General Baker). Deputy Assistant Attorney General Baker recommended civil penalties as an "accommodation" between privacy and law enforcement interests. *House Hearings* at 1550 (statement of Mr. Baker).

---

**1.** The government raises several arguments against the application of the Act in this case, none of which we find persuasive. First, the government argues that bank accounts held by sole proprietorships (here, the Western Heritage Financial Trust) are not protected by the Act, which defines a bank customer as "an individual or a partnership of five or fewer individuals." 12 U.S.C. § 3401(4), (5). The district court found that the Western Heritage account was covered under the Act. The court's holding is supported by a consonant ruling in *Hunt v. SEC,* 520 F.Supp. 580, 604 (N.D.Tex.1981) ("[i]t would strain the imagination to conclude that Congress intended to afford partnerships of five individuals the protections of the Act, but not sole proprietorships."). We agree with the reasoning of both courts. Secondly, the government contends that the information furnished by bank employees to the FBI falls within an exception to the Act that allows financial institutions or their officers to notify a government authority that such institution or agent "has information which may be relevant to a possible violation of any statute or regulation." 12 U.S.C. § 3403(c). The banks in this case, however, did not merely notify the government that they had potentially incriminating information, they actually provided that information without the requisite authorization. The exception of section 3403(c) therefore does not apply.

In the final version of the Act, Congress reduced the notice requirement to 10 days, 12 U.S.C. § 3405, and provided for civil penalties against the government and financial institutions for obtaining or disclosing a customer's financial information without the requisite authorization, 12 U.S.C. § 3417.[2] The remedies are exclusive: "The remedies and sanctions described in this chapter shall be the only authorized judicial remedies and sanctions for violations of this chapter." *Id.* § 3417(d).

◼ Although Congress did not explicitly address the availability of a suppression remedy during its consideration of the Act, we find that remedy to be excluded under section 3417(d). Congress deliberately balanced the right of privacy and the needs of law enforcement when it established the protections and the penalties of the Act. *See* H.R.Rep. No. 1383 at 34, *reprinted in* 1978 U.S.Code Cong. & Ad.News 9273, 9306; *House Hearings* at 1531 (statement of Mr. Baker). To imply a suppression remedy under the Act would alter that balance. Moreover, *Miller* affirmed the denial of a suppression motion. *Miller,* 425 U.S. at 437, 96 S.Ct. at 1621. The Act responded to both the substantive and the procedural aspects of *Miller,* by providing not only a right to financial privacy, but remedies for the violation of that right as well. Had Congress intended to authorize a suppression remedy, it surely would have included it among the remedies it expressly authorized. " 'In the absence of strong indicia of a contrary congressional intent, we are *compelled* to conclude that Con-

gress provided precisely the remedies it considered appropriate.' " *Scientex Corp. v. Kay,* 689 F.2d 879, 883 (9th Cir.1982) (emphasis added by court) (quoting *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 15, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981)).

◼ Because the statute, when properly construed, excludes a suppression remedy, it would not be appropriate for us to provide one in the exercise of our supervisory powers over the administration of justice. Where Congress has both established a right and provided exclusive remedies for its violation, we would "encroach upon the prerogatives" of Congress were we to authorize a remedy not provided for by statute. *United States v. Chanen,* 549 F.2d 1306, 1313 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977). The district court properly admitted the financial evidence.[3]

## II. *Validity of Search Under Warrant*

Miller appeals the denial of his motion to exclude documentary evidence seized from the seat of his car parked in his garage. He argues that, because he arrived home with his car after the warrant for his residence was issued, the warrant did not include the car. Although the timing of his arrival is of no significance to the validity of the search of the garage or of the seizure of evidence from the car, the question whether a warrant for a residence authorizes a search of an attached garage merits attention.

---

2. The aggrieved customer may sue for (1) a statutory penalty of $100; (2) actual damages; (3) punitive damages for willful violations of the Act; and (4) attorney's fees. 12 U.S.C. § 3417(a). The Act authorizes the Director of the Office of Personnel Management to recommend disciplinary action against federal officers and employees who willfully violate its provisions. *Id.* § 3417(b). It immunizes financial institutions and their agents for the disclosure of financial information in good faith reliance on a government certificate of authorization. *Id.* § 3417(c).

3. Appellant argues as well that the government's unauthorized access to his bank records violat-

ed California's Right to Financial Privacy Act. Cal. Gov't Code §§ 7460–93 (West 1980). He does not ask us, however, to suppress the financial evidence on that ground. Such an argument would, in any case, be unavailing. Evidence obtained by a federal officer in violation of federal law, that is nevertheless admissible in federal court, does not become inadmissible by virtue of the fact that the act by which it was obtained violated state law as well. "[T]he bounds of admissibility of evidence for federal courts are not ordinarily subject to determination by the states." *United States v. Hall,* 543 F.2d 1229, 1235 (9th Cir.1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977).

■ We review the district court's denial of the motion to suppress *de novo*, since the question of the scope of the warrant primarily involves issues of law. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, — U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).[4]

■ The warrant states that probable cause exists to believe that financial records and Miller's personal papers are concealed at the "[r]esidence at 1144 Camino Mirasol."[5] The warrant describes the garage door and designates it as part of the residence. On the basis of that description, it seems clear that the issuing magistrate intended to authorize a search of the attached garage. Even were the garage not so described in the warrant, however, we would find that the warrant authorized its search. No reason exists to distinguish an attached garage from the rest of a residence for Fourth Amendment purposes.[6] We have upheld searches of all the property at a listed street address under warrants that recite probable cause as to only a portion of the premises where a multi-unit building or a collection of separate buildings is used as a single entity, where the defendant is in control of the whole premises, or where an entire premises is suspect. *United States v. Alexander*, 761 F.2d 1294, 1301 (9th Cir.1985); *United States v. Whitten*, 706 F.2d 1000, 1008 (9th Cir.1983), *cert. denied*, 465 U.S. 1100, 104

S.Ct. 1593, 80 L.Ed.2d 125 (1984). An attached garage easily meets our test because it is part of the residence. We would impose needless " '[t]echnical requirements of elaborate specificity,' " *United States v. Napoli*, 530 F.2d 1198, 1200 (5th Cir.) (quoting *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965)), *cert. denied*, 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287 (1976), were we to require a magistrate to make a separate determination that probable cause exists to search an attached garage, once the magistrate has already found probable cause for the rest of the residence. We conclude that the search of the attached garage was authorized under the warrant.

■ We need not decide, however, whether a warrant authorizing a search of a garage is sufficient to validate a search of a car found in that garage. Here we conclude that while the seizure of the notebook from the car seat was warranted, no search of the car occurred. The warrant stated that probable cause existed for "... investment records, loan documents ... bank records, account books, receipt books ... and ... items identifying the occupants of the premises." The notebook therefore constituted precisely the type of property whose seizure was authorized by the warrant. We hold that, whatever the appropriate rule may be where an officer observes evidence in plain view in a car located in a

---

**4.** The search was conducted by state officers under a state warrant. We need not decide whether state or federal standards govern the admissibility in a federal prosecution of evidence seized by state officers, because the standard for excluding evidence in California is now identical to the federal constitutional standard. *United States v. Alexander*, 761 F.2d 1294, 1298 (9th Cir.1985); *In re Lance W.*, 37 Cal.3d 873, 879, 210 Cal.Rptr. 631, 639, 694 P.2d 744, 747 (1985).

**5.** The description of the residence reads in full: Residence at 1144 Camino Mirasol, Palm Springs. A light brown colored flat roof and stucco residential building on the east side of Camino Mirasol. It has a semi-circular drive across the front, a set of large, double doors of oxidized copper with cuprous oxide on the surface face [sic] the driveway and street and act as the principal entrance way. The garage

door also faces west is [sic] a similar color to *the rest of the structure,* but is of smooth wood slats running diagonally. The mail box is located at the northwest corner of the property and is made of black painted metal with the numerals 1144 attached, and is surrounded by pine trees.
(Emphasis added).

**6.** We have assumed for purposes of the knock-and-announce rule of 18 U.S.C. § 3109 that a garage is part of a house. *See United States v. Valenzuela*, 596 F.2d 1361, 1365 (9th Cir.) (when officers announce at the front door of a house, they are not required to announce at the entry to the garage), *cert. denied*, 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979); *United States v. Bustamante-Gamez*, 488 F.2d 4, 9–10 (9th Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

public place,[7] where an officer searching a garage pursuant to a lawful search warrant observes material described in that warrant in plain view on the seat of a vehicle, the officer may enter the vehicle and seize that material without obtaining a second warrant. The district court properly denied Miller's motion to suppress.

### III. Jury Instructions

Appellant Miller challenges the district court's failure to read to the jury his requested instruction that it must be unanimous as to the specific acts that formed the scheme to defraud.

▪ When reviewing an allegedly erroneous jury instruction, we consider the instructions as a whole. *United States v. Green*, 745 F.2d 1205, 1209 (9th Cir.1984), *cert. denied*, — U.S. —, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985). The adequacy of the entire charge must be evaluated in the context of the trial. *United States v. Marabelles*, 724 F.2d 1374, 1382 (9th Cir.1984). Although the court must give an instruction relating to any legitimate theory of the defense that is supported by the evidence, the court has broad discretion in formulating the instructions, and neither party may demand specific language. *United States v. Wellington*, 754 F.2d 1457, 1463 (9th Cir.), *cert. denied*, *Utz v. United States*, — U.S. —, 106 S.Ct. 592, — L.Ed.2d — (1985). A challenge to the language or to the formulation of an instruction must demonstrate an abuse of disretion. *Green*, 745 F.2d at 1209.

In the present case, the court instructed the jury that the government must prove beyond a reasonable doubt the existence of a fraudulent scheme substantially as broad as that charged in the indictment. The court explained the elements of mail and wire fraud correctly, and gave the standard instructions on reasonable doubt. The court further advised the jury that the verdict must be unanimous.

▪ In a mail or wire fraud prosecution, jurors must be instructed that they must agree on the existence of a single scheme to defraud. *United States v. Mastelotto*, 717 F.2d 1238, 1247–48 (9th Cir. 1983). However, a specific instruction that the jury must agree on a particular set of facts is required only where it appears that a conviction might rest upon different jurors having found the existence of different facts, in violation of the defendant's right to a unanimous verdict. That situation arises where the complex nature of the evidence, a discrepancy between the evidence and the indictment, or some other particular factor creates a genuine possibility of juror confusion. *United States v. Ferris*, 719 F.2d 1405, 1407 (9th Cir.1983); *United States v. Echeverry*, 719 F.2d 974, 975, *modifying* 698 F.2d 375 (9th Cir.1983). Otherwise, a general instruction on the unanimity of the verdict will suffice. *Ferris*, 719 F.2d at 1407.

▪ This case presents none of the factors that require an instruction on unanimity regarding specific acts. The indictment alleged one unified scheme to defraud. The evidence at trial supported the existence of that scheme, and was not at variance with the indictment. Neither the indictment nor the evidence created any ambiguity as to the possible existence of multiple schemes. Although the jury was not instructed on the need to agree on the principal factual elements involved in the charge of mail and wire fraud, given the nature of the evidence before it, it could not have convicted appellants without so agreeing. We find that the court's instructions were proper and that it did not err in failing to give a special unanimity instruction regarding the specific acts constituting the scheme.

### IV. Ex Parte Communication

▪ The failure of the court to notify appellants or their counsel of the jury's

---

**7.** Professor LaFave states that exigent circumstances are required before officers acting without warrant may enter a vehicle and seize evidence, even though the vehicle is parked in a public place and the officers observe the evidence in plain view. 2 W. LaFave, *Search and Seizure* § 7.5, at 592 (1978); *see also* 1 *id.* § 2.2, at 243–45.

deadlock vote, and the court's ex parte message to the jury to continue its deliberations, violated appellants' constitutional rights. Nevertheless, we are required to affirm their convictions.

The Constitution, the fundamental principles of jury trial, and the Federal Rules of Criminal Procedure guarantee a defendant the right to be present at every stage of trial. *See, e.g., Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970) (right of presence secured by the confrontation clause); *Snyder v. Massachusetts,* 291 U.S. 97, 105–106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (presence guaranteed by due process clause); *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 2094–95, 45 L.Ed.2d 1 (1975) (rule of orderly conduct of jury trial requires defendant's presence); Fed.R.Crim.P. 43(a) ("The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence....").

■ Ex parte communications from the judge to the jury violate a defendant's right to due process of law. As the Supreme Court said recently, the "constitutional right to presence ... is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." *United States v. Gagnon,* — U.S. —, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985). The Court also held that, in certain limited stiuations, the defendant's right of presence may be adequately protected by the presence of his or her counsel. *Id.* at

1484–85; *see also Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934). Here, since defendants' counsel as well as the defendants were absent we need not decide whether the presence of counsel alone would have been sufficient. In this case, the absence of both is constitutionally fatal.[8]

■ A defendant's participation in formulating a response to a deadlocked jury, whether through his counsel or by his personal presence as well, may be important to ensuring the fairness of the verdict. Certain jury deadlock situations require the calling of a mistrial. The defendant should be given the opportunity to analyze the particular circumstances and assess whether a mistrial is appropriate. Furthermore, minority members of a deadlocked jury are especially susceptible to pressure from the majority to change their views. A defendant should be afforded the opportunity to request that the jury be reinstructed on the burden of proof or on its members' duty to decide according to their own consciences.

■ A violation of a defendant's due process right to be present at all stages of trial is subject, however, to the harmless error rule of *Chapman v. California,* 386 U.S. 18, 21–22, 87 S.Ct. 824, 826–27, 17 L.Ed.2d 705 (1967). *United States v. Gagnon,* 721 F.2d 672, 678 (9th Cir.1983), *rev'd on other grounds,* — U.S. —, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam). In order to establish harmlessness, the government must "prove beyond a reasonable doubt that the error complained of did not

---

**8.** Nor do we decide whether appellants had a right under Fed. R. Crim. P. 43 to be personally present when the court responded to the jury's deadlock note. In *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), the Court noted that its earlier cases grounded the right of presence in basic principles of trial by jury, but found it sufficient to rely on Fed.R. Crim.P. 43 in order to reverse a conviction obtained after an ex parte communication between the judge and the jury regarding the verdict. The Court was not required in *Rogers* to reach the constitutional issue, because it found *reversible* error under the Rule. In the present case, were we to find that the court's ex parte

message violated Rule 43, we would be required to find such error to be harmless. (The reasons supporting our determination that the constitutional error was harmless, *see* text *infra,* would necessarily satisfy the more lenient standard for nonconstitutional error of *United States v. Birges,* 723 F.2d 666, 670 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 200, 83 L.Ed.2d 131 (1984)). We would then be compelled to address the constitutional question and apply, as we do *infra,* the more stringent standard that governs harmless error in cases in which the error is of constitutional magnitude.

contribute to the verdict obtained." *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

■■■ To determine whether the failure of the court to consult with appellants (and hereinafter we use the term "appellants" to refer to defendants and their counsel collectively) before responding to the deadlocked jury contributed to the jury's return of the verdict, we analyze several factors. First, we consider the probable effect of the message actually sent, second, the likelihood that the court would have sent a different message had it consulted with appellants beforehand and third, whether any changes in the message that appellants might have obtained would have affected the verdict in any way. Applying the *Chapman* standard, we conclude for the reasons given below that the error in this case was harmless.

Judge Thompson's note asking that the jury continue its deliberations did not suggest that the jury must reach a verdict, or that the court would not ultimately accept a deadlock. The note was not, therefore, inherently coercive of the verdict obtained. Furthermore, upon releasing the jurors the previous afternoon, Judge Thompson had told them that another judge would be taking the verdict, should they arrive at one the following day. He had also already acknowledged the possibility that the jury might be required to continue its deliberations beyond Friday.[9] His note was consistent with that expectation; it meant just what it said—that the jury should continue deliberating, not, that it must reach a verdict.

9. We reject appellants' contention that the court's message upon dismissing the jury Thursday afternoon indicates that the court anticipated a deadlock and improperly predetermined that it would not accept a hung jury. There is no evidence that the court foresaw a deadlock; the instruction shows only that the court foresaw the need for additional deliberation time after Friday, given the length of the trial. Had the court announced an illegal procedure on Thursday, appellants would have been required to object at that time.

Facially non-coercive ex parte messages from the court to the jury may, however, be deemed coercive in light of the jury's response. In *Krische v. Smith,* 662 F.2d 177 (2d Cir.1981), an initially deadlocked jury returned its verdict 1 hour and 20 minutes after receiving an ex parte note, essentially identical to the one before us, instructing the jury to continue its deliberations. The sending of the note to the jury was held to constitute reversible error. The court distinguished other cases, in which convictions were affirmed, where the trial court had instructed a deadlocked jury to continue its deliberations, on the ground that the juries in those cases deliberated for a longer period of time following receipt of the ex parte message. *Id.* at 179 (distinguishing *United States v. Rodriguez,* 545 F.2d 829, 830–31 (2d Cir.1976) (deliberations lasted 3 hours after receipt of message), *cert. denied,* 434 U.S. 819, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977), and *United States v. Taylor,* 562 F.2d 1345, 1366 (2d Cir.) (deliberations lasted 2 days), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977)). In the present case, the jury's response to the court's instruction does not suggest that the instruction had a coercive effect upon the jury's deliberations. The jury returned its verdict 3½ hours after the note was delivered. Given all the circumstances before us, we are convinced beyond a reasonable doubt that in this case the length of time the jury deliberated following its receipt of the court's message demonstrates that it reached its decision based solely on its own reasoned consideration of the evidence and the law, and not as the result of actual or perceived judicial pressure.[10]

10. We note as well that deliberations of 3½ hours are within the range of time that we have considered adequate in particular circumstances to rebut the charge that an *Allen* instruction coerced a verdict. *See, e.g., United States v. Beattie,* 613 F.2d 762, 765–66 (9th Cir.) (3½ hours), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980); *United States v. Moore,* 653 F.2d 384, 390 (9th Cir.) (2 hours), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 680, 70 L.Ed.2d 646 (1981); *United States v. Hooton,* 662 F.2d 628, 637 (9th Cir.1981) (*Allen* charge given in the morning, verdict delivered early afternoon), *cert. denied,* 455 U.S. 1004, 102 S.Ct. 1640, 71

Appellants argue, however, that had they been present and been afforded an opportunity to present their views the court might have taken a different course. Appellants offer several possible results that might have followed had they received proper notification of the deadlock: The court might have granted a motion for a mistrial, instructed on a lesser included offense, reread the reasonable doubt instruction to the jury, or counselled the jurors not to surrender their honest beliefs. We consider these possibilities either unlikely to have occurred or unlikely to have affected the jury's verdict.

Given the brevity of the jury's deliberations prior to the time it sent its note to the court, and the court's anticipation that the jury might be out through at least Monday, it is apparent that the court would have considered a mistrial motion premature and would have denied the motion. For the same reason, it is clear that the court would have been unlikely to instruct on a lesser included offense. The requested instructions regarding the standard of proof and the duty to decide according to individual beliefs were repetitive of the court's instruction given the previous day and upon dismissing the jury the previous evening (the "defendants as well as the government count on you to keep your own consciences relative to this case, and that goes before you go in, all the time you're in, and after you're out."). Accordingly,

we conclude that there is almost no possibility that the court would have given those instructions again early the next morning. Finally, even had the court decided to reinstruct the jury on reasonable doubt and individual responsibility, we are fully persuaded that its doing so would not in any way have affected the jury's deliberations or its return of the verdict.[11]

It is clear beyond a reasonable doubt that the court's erroneous denial of appellants' right to participate in the process of determining the appropriate response to the deadlock note did not contribute to the verdict obtained in this case. However, as we have emphasized, our conclusion that the error was harmless rests on the particular facts before us. A court's communication with a deadlocked jury in the absence of the defendant and counsel could well, under a different set of facts, require reversal of a conviction. Ex parte communications with a jury undermine basic principles of due process. Every court has a duty assiduously to avoid them.

AFFIRMED.

---

L.Ed.2d 873 (1982). Although *Allen* instructions are framed and delivered in the presence of counsel, by their terms they are potentially more coercive than are instructions merely to continue deliberating. A test for evaluating the coerciveness of an *Allen* instruction is therefore ordinarily more than adequate to evaluate the coerciveness of the present instruction. However, all cases of the type before us are fact specific, and various factors in addition to the length of time that transpires between the challenged instruction and the verdict must often be considered.

11. Appellants urge us to apply the test articulated in *Krische v. Smith*, 662 F.2d 177, 180 (2d Cir.1981), for evaluating the harmlessness of court's ex parte communication with a jury. The test, as stated, could be construed as being incomplete under *Chapman*. *Krische* framed the harmless error test for ex parte communica-

tions not as "whether the language of the court's communication with the jury in itself constituted reversible error, but rather [as] whether the input of the defendant and his counsel at the appropriate moment could have substantially affected the content of the message to the jurors during a vital portion of their deliberations when, far from reaching any verdict, they had reported a deadlock." *Id.* We believe that *Chapman* requires the reviewing court to determine not only whether the content of the message would have been different in the absence of the constitutional error, but also whether any such difference would have affected the jury's return of the verdict. As stated in the text above, we are convinced beyond a reasonable doubt that none of appellants' suggested messages would have affected the jury's deliberations or its return of the verdict.