**Major Gregory L. RUSSELL, USAF, Plaintiff,**

v.

**The DEPARTMENT OF the AIR FORCE; Dr. Sheila Widnall, ex officio, the Secretary of the Air Force; Lieutenant General Paul Stein, Superintendent, United States Air Force Academy, ex officio, Brigadier General Ruben A. Cubero,**

Dean of the Faculty, United States Air Force Academy, ex officio, Lieutenant Colonel Bradford L. Buchanan, USAFR, ex officio, American Express Travel Related Services Company, Inc., and Citicorp Diners Club, Inc., Defendants.

Civil A. No. 95–B–1428.

United States District Court,
District of Colorado.

Jan. 26, 1996.

Alison Ruttenberg, Denver, CO, Denis H. Mark, William C. Waller, Jr., Waller and Mark, P.C., Denver, CO, for plaintiff.

Linda Surbaugh, Assistant U.S. Attorney, Denver, CO, Arthur R. Goldberg, Alina S. Kofsky, Federal Programs Branch, Civil Division, U.S. Department of Justice, Washington, DC, Major Jo Ann Stringfield, Air Force Legal Services Agency, General Litigation Division, Arlington, VA, for government defendants.

John M. Vaught, Beth N. Nesis, Holland & Hart, Denver, CO, for American Express and Citicorp Diners Club.

G. Hamilton Loeb, Paul, Hasting, Janofsky & Walker, Washington, DC, Craig S. King, Richard J. Webber, Arent Fox Kintner Plotkin & Kahn, Washington, DC, for American Express Travel Related Services.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

In this action under the Right to Financial Privacy Act (RFPA), 12 U.S.C. § 3401 *et seq.*, plaintiff, Major Gregory L. Russell, U.S.A.F. (Russell), moves, pursuant to Fed. R.Civ.P. 65, for a preliminary injunction against the Air Force defendants, to enjoin them from using, photocopying, or disseminating his financial records obtained from codefendants American Express Travel Related Services Company, Inc. (American Express) and Citicorp Diners Club (Citicorp). Jurisdiction is proper under 12 U.S.C. § 3416. The motion is fully briefed and heard. Plaintiff has failed to show likelihood of success on the merits of his claim. Therefore, I will deny the motion for preliminary injunction.

### I.

The following facts are not in dispute. Major Russell is an active duty member of the United States Air Force stationed at the United States Air Force Academy in Colorado Springs, Colorado. From fall, 1989, to February 10, 1994, Russell was the coach of the United States Air Force Academy forensics team. During that time, Russell traveled with the team to various forensic competitions. In connection with his duties in the Air Force, Russell applied for and obtained American Express and Citicorp Diners Club charge cards available to him through a government travel program between the Air Force, the General Services Administration (GSA), and the respective charge card com-

panies. As a cardholder, Russell.is personally liable for the charges incurred on these cards. The cards are not to be used for personal purposes, being limited to use in connection with official United States government business.

In 1980, the Office of Management and Budget, in conjunction with the GSA, the Departments of Defense and State, the Office of Personnel Management, and the General Accounting Office examined government travel patterns, policies, and procedures. (Def.Exh. 1) Their findings, known as the Interagency Travel Management Improvement Project (ITMIP), resulted in new GSA procurement techniques designed to reduce the cost of federal travel. *Id.* at 19.

Pursuant to 40 U.S.C. § 481(a), the administrator of GSA is authorized to enter into contracts on behalf of federal agencies. By this authority, in 1983 GSA opened competitive bidding for a contractor. Thereafter, GSA awarded the contract to Citicorp (South Dakota), N.A. and its subsidiary, Citicorp Diners Club, Inc. In 1988, GSA awarded a "follow-on" contract to Citicorp. In 1993, once again after competitive bidding, GSA awarded the contract to American Express.

Under the GSA contracts, Citicorp and American Express issued government cards to military personnel designated by authorized representatives of the Air Force. On the card itself, under the employee's name, American Express imprints in raised letters the name of the government agency through which the card was issued. Similar designation was typically imprinted on the Citicorp cards. Eligibility for the government card is determined by Air Force commanders who have authority to deny a government card to anyone with financial problems or a history of credit card abuse. Cardholders receive the government card without charge and with no credit-check or limit. Cardholders are charged no interest or late fees on outstanding balances. Use of the government card is limited to charging expenses and obtaining cash advances for official government purposes. The Air Force then reimburses the cardholder for official expenses charged in accordance with the joint federal travel regulations. The Air Force is not liable to the card issuer for payment of the charge card balance. Rather, the individual cardholder is personally liable for all charges incurred on the government card. Typically, as in this case, the monthly charge statement is sent to the individual's home address.

The Citicorp Diners Club credit card application and agreement states, "[b]y signing below I ... agree to be bound by the terms and conditions of the Diners Club government program employee card account agreement accompanying the card ... and acknowledge that the card is to be used for official government business." (Exh. 6).

The American Express government card application agreement recites, "[b]y signing below I agree to use the card for official travel and official travel-related expenses and to be bound by the terms and conditions of the attached agreement governing my use of the government card." The agreement also provides that the recipient "agree[s] to use the government card only for official travel and travel-related expenses away from the cardholder's official duty station." (Exh. 7).

Pursuant to the GSA contracts, Citicorp and American Express are required to assemble and maintain monthly reports on government cardholder accounts. These reports include an account aging report which is sent to the Air Force each month. This report lists every government cardholder's account, with delinquent amounts listed in columns headed 30–60–90–120 days. American Express also sends out a separate 60–day list with names of Air Force military personnel who are 60 days delinquent in paying their account. Master Sergeant Jerry C. Pio (Pio), chief of travel pay at the United States Air Force Academy, receives this report and sends a copy to the member's unit resource advisor or sub-account coordinator.

Pio received and forwarded one or two 60–day delinquent notices to plaintiff's unit. Pio then called American Express on June 27, 1994, and requested that they telecopy to him Russell's American Express government card statements. These statements were requested by the Air Force because Russell was under "investigation." (Doyon Declaration, ¶ 4). Pio received the requested finan-

cial statements which were forwarded through the Air Force Office of Special Investigations (OSI), along with the results of OSI's investigation, to the Air Force Academy's legal office. *Id.* Defendant, Major Kurt D. Schuman (Schuman), Staff Judge Advocate at the Air Force Academy, received the documents and contacted Citicorp Diners Club and American Express. He requested and obtained further information from the two companies, including the current status of Russell's accounts. Schuman then drafted criminal charges against Russell based on the information. (Schuman Declaration ¶ 5).

By March, 1995, Schuman assigned defendant, Captain Thomas F. Doyon (Doyon), as trial counsel and prosecutor. (Doyon Declaration ¶ 3). Doyon drafted "blanket" requests for records from both American Express and Citicorp Diners Club. (Def.Opp. to PI p. 10). No notice pursuant to the RFPA was ever provided to Russell.

The Air Force held an Article 32 proceeding, *see* 10 U.S.C. § 832, (similar to a civilian grand jury or preliminary hearing proceeding) on April 21, 1995 at which the American Express and Citicorp financial records were considered in the military investigating officer's determination that there was sufficient evidence to bring charges against Russell at a general court-martial.

In late summer 1994, Russell applied for early retirement under a plan whereby the Air Force opened 1000 slots to officers who met certain requirements. However, Russell's application for early retirement was denied because he was "under investigation." On June 5, 1995, Russell filed this action. On June 16, 1995, the Air Force withdrew the charges preferred against Russell "while retaining the full range of disciplinary and administrative options...." (Def.Opp. p. 11).

## II.

Jurisdiction

■ Alleged violations of the RFPA are "peculiarly" within the jurisdiction of Article III courts and not the military justice system. *See United States v. Wooten,* 34 M.J. 141 (CMA 1992); 12 U.S.C. § 3416. Thus, it is exclusively the province of Article III courts to grant relief for violations of the RFPA. I recognize, as I did in *McDonough v. Widnall,* 891 F.Supp. 1439, 1447 (D.Colo. 1995), that the effect of injunctive relief under the RFPA in this case could have collateral consequences upon court-martial and administrative actions against Russell. The potential for such collateral consequences, however, does not diminish my clear equitable jurisdiction to grant relief in this case. Indeed, that jurisdiction rests exclusively with Article III courts beginning, in the first instance, with "any appropriate United States district court." §§ 3416 and 3418.

## III.

Preliminary Injunction

■ The purpose of a preliminary injunction under Fed.R.Civ.P. 65 is to preserve the status quo between the parties pending a final determination on the merits. *University of Texas v. Camenisch,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980). Preliminary injunction is an extraordinary remedy—an exception rather than the rule. *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984). Thus, the right to relief must be clear and unequivocal. *See Penn v. San Juan Hosp.,* 528 F.2d 1181, 1185 (10th Cir.1975). *See generally* 11 C. Wright & A, Miller, *Federal Practice and Procedure* § 2948m at 428–29 nn. 19–21 (1973 & 1991 Supp.).

■ A preliminary injunction is an equitable remedy that invokes the sound discretion of the district court. *Lundgrin,* 619 F.2d at 63. The burden is on the movant to make a *prima facie* showing of a probable right to the ultimate relief and a probable danger of injury if the motion is denied. *Id.* A preliminary injunction may issue if the movant clearly shows: (1) irreparable injury if the injunction is not granted; (2) the threatened injury outweighs any harm the preliminary injunction will cause the opposing party; (3) the preliminary injunction is not adverse to the public interest; and (4) a substantial likelihood of success on the merits. *SCFC ILC, Inc. v. Visa USA, Inc.,* 936

F.2d 1096, 1098 (10th Cir.1991); *Lundgrin,* 619 F.2d at 63.

Russell seeks to enjoin Air Force defendants from "using, photocopying or disseminating the Plaintiff's financial records from American Express and Citicorp, that were obtained in violation of the Right to Financial Privacy Act." (Motion ¶ 21). Air Force defendants contend that the RFPA does not apply to the information obtained from Citicorp and American Express in connection with the government card travel program. Rather, these defendants state they properly obtained the financial records pursuant to 5 U.S.C. § 552a, commonly known as the Privacy Act. Alternatively, if the RFPA does apply, defendants state that they obtained the information properly as a "co-customer" of Citicorp and American Express as Russell's "authorized representative." Air Force defendants also argue pursuant to 12 U.S.C. § 3403(d) that they are entitled to the records incident to collecting a debt. For the following reasons, I will deny the preliminary injunction.

**A. Substantial likelihood that Plaintiffs will prevail on the merits**

**1. RFPA or Privacy Act**

■ Russell argues that the financial records disclosed by American Express and Citicorp are subject to the Right to Financial Privacy Act, (RFPA), 12 U.S.C. § 3401 *et seq.* Air Force defendants argue that the Privacy Act of 1974, 5 U.S.C. § 552a *et seq.* controls. Based on principles of statutory construction, I conclude that the RFPA applies to financial records generated under the government card programs.

■ The "cardinal canon" on statutory construction is that "courts must presume that the legislature says in the statute what it means and means in the statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Also, I presume that Congress is aware of other existing law when it passes legislation. *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32, 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990).

■ Statutes that relate to the same subject matter are considered *in pari materia* and should be construed together. *Barth v. United States,* 28 Fed.Cl. 512, 515 (1993). In construing statutes, the specific governs the general. *Morales v. Trans World Airlines, Inc.* 504 U.S. 374, 384–85, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992). If construction *in pari materia* leads to irreconcilable inconsistency, the later and more specific statute usually controls the earlier and more general. *Hellon & Associates, Inc. v. Phoenix Resort Corp.,* 958 F.2d 295, 297 (9th Cir.1992). Moreover, regardless of the priority of enactment, a specific statute should not be deemed to be controlled or nullified by a general statute absent definite contrary intention. *Franklin v. United States,* 992 F.2d 1492, 1502 (10th Cir.1993).

**a. Privacy Act, 5 U.S.C. § 552a**

■ In response to concerns raised regarding personal privacy, Congress enacted the Privacy Act of 1974, 5 U.S.C. § 552a, to govern information data banks maintained by the federal government. Pub.L. No. 93–579, 88 Stat. 1896 (1974), *codified, as amended,* at 5 U.S.C. § 552a; L. Richard Fischer, *The Law of Financial Privacy, 2d ed.,* ¶ 8.02[1] (1991). The Privacy Act is based on the principles that there should be no secret federal information files or government data banks maintained on individuals and that the dissemination of, and access to, personal information in government data banks should be strictly controlled. *A Citizen's Guide on Using the Freedom of Information Act and the Privacy Act of 1974 to Request Government Records,* H.R.Rep. No. 101–193, 101st Cong., 1st Sess. 15, 18–19 (1989); 5 U.S.C. § 552a notes.

■ Government contractors who maintain personal records on behalf of an agency are subject to the requirements of the Privacy Act "to prevent federal agencies from contracting with outside recordkeeping organizations in order to avoid the requirements of the Privacy Act." 5 U.S.C. § 552a(m); Fischer, *The Law of Financial Privacy;* ¶ 8.02[2]. Thus, the focus of the Privacy Act is on the actions of *government*

agencies in disclosing personal information maintained by *them*.

 b. Right to Financial Privacy Act 12 U.S.C. § 3401 *et seq.*

■ In contrast, the RFPA, 12 U.S.C. § 3401 *et seq.* prohibits *financial institutions* from providing the *government* with information about their customers' financial records unless the customer authorizes the release or the government obtains a valid subpoena or warrant. *United States v. Frazin*, 780 F.2d 1461 (9th Cir.1986); 12 U.S.C. § 3402.

Congress passed the RFPA, in part in response to *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). There, the Supreme Court held that a bank customer has no constitutionally protected privacy interest in bank records. *See* H.R.Rep. No. 1383, 95th Cong., 2d Sess. 34 (1978). The RFPA "fill[s] the void in ... Federal law [left by *Miller* ] regarding statutory protection against unrestricted access to third-party records" by the federal government. Hearings on S. 2096, S. 2293, and S. 1460 before the Subcomm. on Financial Institutions of the Senate Comm. on Banking, Housing, and Urban Affairs, 95th Cong., 2d Sess. 154 (1978) (statement of Senator Mathias). Both Congress and the Executive regarded the Act as a compromise between a "bank customer's right of financial privacy and the need of law enforcement agencies to obtain financial records pursuant to legitimate investigations." *United States v. Frazin*, 780 F.2d at 1465; *See* H.R.Rep. No. 1383 at 34 reprinted in 1978 U.S.Code Cong.Ad. News 9273, 9306.

■ The RFPA "provid[es] that the government cannot gain access to a bank customer's financial records or other information without first complying with the notice and procedure requirements of the RFPA." *Adams v. Board of Governors of the Federal Reserve Bd.*, 659 F.Supp. 948, 954 (D.Minn. 1987). *See also Donovan v. National Bank of Alaska*, 696 F.2d 678, 683 (9th Cir.1983). The RFPA, enacted four years after the Privacy Act, prescribes detailed, narrowly-tailored procedures by which the government may obtain financial institution records. *See* 12 U.S.C. § 3402; *McDonough*, 891 F.Supp.

at 1448. For purposes of the RFPA, Congress defines "Government authority" to mean "any agency or department of the United States, or any officer, employee, or agent, thereof." 12 U.S.C. § 3401(3).

■ In deciding which statute controls in this case, I also look to the respective subject matter of the Privacy Act and the RFPA. The RFPA regulates disclosure to the government of a citizen's financial information maintained by a private financial institution. In contrast, the Privacy Act governs disclosure to citizens of information maintained by the federal government. American Express and Citicorp disclosed financial information about Major Russell to the federal government. This information then became part of the information data banks maintained by the government. It is undisputed that at the request of the Air Force, Russell's financial information flowed from American Express and Diners Club, to the federal government. Thus, the source of the information was the financial institutions and the recipient of the information was the federal government. Because the Privacy Act governs the release of information from the government, while, in contrast, the RFPA regulates the release of information from financial institutions to the federal government, as between the RFPA and the Privacy Act, the RFPA would apply to the release of Major Russell's financial information. Construing the Privacy Act and the RFPA *in pari materia*, I find and conclude that the RFPA was more recently enacted and, as applied here, is substantively more specific in its provisions than the Privacy Act. Accordingly, I apply the RFPA rather than the Privacy Act to the financial records disclosed in this case.

 2. Authorized Representative

■ The RFPA limits the kinds of customers to whom it applies. 12 U.S.C. §§ 3401(2), (4), and (5). "Customer" is defined as *"any person or authorized representative of that person* who utilized or is utilizing any service of a financial institution." 12 U.S.C. § 3401(5) (emphasis supplied). "Person" is defined as "individuals or partnerships of five or fewer individuals." 12 U.S.C.

§ 3401(4). The Air Force defendants do not meet the RFPA definition of "person."

The Air Force defendants argue, however, that the Air Force is Russell's "authorized representative" and, thus, is a "customer" as defined by the RFPA. Thus, they contend they are entitled to the records obtained by them from Citicorp and American Express. I agree.

The RFPA contains no restriction on who may be an authorized representative and it does not require an authorized representative to be designated in any formal or particular manner. The RFPA does not even define authorized representative. Consequently, I turn to other sources to define authorized representative within the context of the RFPA.

■ "The touchstone in construing statutory language is legislative intent." *Stauffer Chemical Co. v. EPA*, 647 F.2d 1075, 1078 (10th Cir.1981); *see Caminetti v. United States*, 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917). I am mindful that the plain meaning test is useful in determining legislative intent. *Id.* However, the ordinary and usual meaning commonly attributed to the words "authorized" and "representative" each spans several paragraphs in the dictionary. *Webster's Third New International Dictionary*, pp. 146–47, 1926–27 (1986). Such numerous and varied definitions are not helpful in determining legislative intent. Thus, I look to legislative history.

As indicated, Congress passed the RFPA, in part in response to *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). *See H.R.Rep. No.* 1383, 95th Cong., 2d Sess. 34 (1978); Hearings on S. 2096, S. 2293, and S. 1460 before the Subcomm. on Financial Institutions of the Senate Comm. on Banking, Housing, and Urban Affairs, 95th Cong., 2d Sess. 154 (1978) (statement of Senator Mathias). More specifically, Congress enacted the RFPA "in response to a pattern of government abuse in the area of individual privacy." *Donovan v. National Bank of Alaska*, 696 F.2d 678, 683 (9th Cir. 1983).

The relationship between and among American Express, Citicorp, the Air Force defendants, and Russell is instructive in defining the status of Russell and the Air Force under the RFPA. First, GSA, on behalf of the Air Force, negotiated the terms and conditions of the government card contract between the Air Force and Citicorp and American Express. *See* 40 U.S.C. § 481(a)(4); (Exh. 1, 2, 3). Second, pursuant to the GSA contracts with Citicorp and American Express, Russell was issued Citicorp and American Express government cards. However, Russell was issued these cards only after he completed and signed applications that established his agreement with the card issuers.

## Citicorp Agreement

The Citicorp application contains several sections reflecting the nature of the relationship between the applicant and the government agency for whom the applicant worked. First, the form is titled "Employee Card Application." Next, the applicant information section is titled:

Diners Club Government Card Program

Employee Card Application

Individual Billing

(Exh. 6)

The portion directly above the applicant's signature includes the following statement:

By signing below, I (I) ask Citicorp … to open a Card Account in my name and issue a Diners Club Card … to me, (II) agree to be bound by the terms and conditions of the Diners Club Government Card Program Employee Card Account Agreement accompanying the Card, (III) agree to be liable for all charges to the Card Account in accordance with such Agreement, and (IV) acknowledge that the Card is to be used for official Government business.

*Id.*

The next section is highlighted and titled "Agency Information and Authorization." The "Agency" section has blocks for the "Name of Agency Requesting Issuance of Card," the "Address of Agency," and "Summary Account Number." This section is followed by a signature section containing the following statement:

By signing below as the *duly authorized representative* of the Agency named above, I ask Citicorp ... to open a Card Account in the name of, and to issue a Diners Club Card ... to, the employee named hereon in accordance with General Services Administration Contract Number GS–OOF–95032.

*Id.* (emphasis supplied).

This is followed by blocks labeled "Name of Authorizing Officer or Individual," "Title of Authorizing Officer or Individual," and "Authorizing Signature." *Id.* The next page of Exhibit 6 is titled "APPLICANT ACKNOWLEDGMENT" (emphasis in original) and contains the following statement directly above the applicant signature line:

I certify that I have received, read, and understand the "Description of Employee Rights and Obligations for Contractor–Issued Charge Cards." I will abide by the rules, regulations, and other instructions that are issued by my Government Agency and Citicorp Diners Club for the use of any Card issued to me for official Government travel.

Centered at the bottom of the page is the statement:

PLEASE RETURN THIS ACKNOWLEDGMENT TO YOUR GOVERNMENT TRAVEL MANAGEMENT SYSTEM COORDINATOR.

(Exh. 6) (emphasis in original).

Citicorp also provided the employee with the "Employee Card Account Agreement." (Exh. 6). This form is titled "DINERS CLUB GOVERNMENT CARD PROGRAM EMPLOYEE CARD ACCOUNT AGREEMENT." (emphasis in original). Pertinent provisions include the following:

"Agency" means the United States federal agency, ... participating in the Diners Club Government Card Program that has *authorized Diners Club to issue the Card to and to open an account with Diners Club ("Account") for the agency employee* named on the Card.

The words "I" "me" and "my" refer to the agency employee named on the card who has asked Diners Club to issue the Card and open the Account, and who has agreed to be bound by this Agreement.

*The Card and the Account are provided by Diners Club under the authority of my Agency. The Card and the Account are not to be used for personal purposes and may only be used in connection with official United States Government business.*

Diners Club will continue to issue renewal or replacement Cards until *I or my Agency* tells Diners Club to stop or the Card and the Account are canceled.

The Card and the Account will be automatically canceled upon the (a) *end of my employment with my Agency regardless of the reason;* (b) *termination or expiration of the GSA Contract;* (c) *request of my Agency;* (d) *request of Diners Club with the permission of my Agency;* ....

Delinquency may result in suspension of Card privileges or cancellation of the Card and the Account *if Diners Club obtains the permission of my Agency* ....

(Exh. 6) (emphasis supplied).

**American Express Agreement**

The American Express Government Card application is headed:

GOVERNMENT CARD APPLICATION & AGREEMENT

For Employees of the United States Government

(Exh. 7) (emphasis in original).

The top of the application directs that a copy of the application be returned to:

American Express

Government Account Unit

P.O. Box 53609

Phoenix, AZ 85072–3609

*Id.* (emphasis supplied).

The next portion of the application is completed by the employee and requests personal information about the employee. This section also includes blanks for the agency name, address, and office phone number.

Directly above the space for the "Employee Signature" is the following statement:

By signing below, I (a) request that a *Government Card* be issued in my name, (b) agree to use the Card for *official travel*

*and official travel related expenses* and to be bound by the terms and conditions of the attached Agreement governing my use of the Government Card and (c) authorize American Express to verify information supplied on this application.

(Exh.7) (emphasis supplied).

The next section of the application states in highlighted text, "TO BE COMPLETED BY AGENCY PROGRAM COORDINA-TOR." (emphasis in original). This section seeks such information as the "Control Account" number, agency name, address, and the "ATM Cash Limit" allowed for the agency employee. The bottom of the form contains the following signature section:

> By signing below, I hereby authorize, on behalf of the Agency/Organization indicated above, that a Government Card be issued to the employee named above....
> Name of Agency Official _____ Title/Rank
> _____
> Signature _____ Date _____

(Exh.7) (emphasis supplied).

Below this section is a Privacy Act Notice followed by:

> NOTE: See Reverse Side for **Important Information**

(Exh. 7) (emphasis in original).

The reverse side is titled:

> AGREEMENT BETWEEN AGENCY/ORGANIZATION EMPLOYEE AND AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.

The Agreement states in pertinent part:

> IMPORTANT: BEFORE YOU SIGN THE APPLICATION, READ THIS AGREEMENT THOROUGHLY.
> DEFINITIONS (emphasis in original).
> ... [T]he works "you," "your," or "Government Cardholder" means the *Agency employee* named on the Government Card. The word "Agency" means the United States federal agency ... participating in the American Express Government Program under the General Services Administration contract no. GS–COF–34139 ... that has *authorized American Express to open an account (the "Card Account") for the Agency employee (the "Government Cardholder")*. *A Card issued to a Govern-*

*ment Cardholder is called a Government Card.*

> *You agree to use the Government Card only for official travel and official travel related expenses away from your official station/duty station* (lodging, meals, incidentals) and submit the charges for same for Agency reimbursement in accordance with Agency policy. *You understand that the Card and the Account are not to be used for personal purposes.*

. . . . .

> We will continue to issue renewal or replacement Card, until *you or the Agency* tell us to stop or the Account is suspended or canceled....

. . . . .

> The Card and the Account will be automatically canceled upon the (a) *termination of your employment with Agency regardless of the reason;* (b) *termination or expiration of the GSA Contract;* (c) *request of the Agency;* (d) *request of American Express with the permission of the Agency....*

. . . . .

> You, as the Government Cardholder, are responsible for making payment to American Express.
> *You are not permitted to use the Government Card to incur charges for any other purposes including personal purposes.* (sic). *Such charges shall be considered as unauthorized charges but you will nevertheless be personally liable to us for them, and we will look to you for payment.*
> ... *With the consent of the Agency,* the Card Account may be canceled if [an] undisputed amount is not paid in full within 120 days of the date of the first billing statement on which the Charge appears.

(Exh. 7) (emphasis supplied).

 Restatement (Second) of Agency § 1 defines agency as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." The one for whom action is to be taken is the

"principal" and the one who is to act is the "agent." *Id.* Further, a "master" is a type of principal who employs a "servant", a type of agent, to perform service in his affairs and who controls or has the right to control the physical conduct of the "servant" in the performance of the service. Restatement (Second) of Agency § 2. "Principal" is further described as "disclosed" if, "at the time of a transaction conducted by an agent, the other party thereto has notice that the agent is acting for a principal and of the principal's identity." *Id.* at § 4. Unless otherwise agreed, a person making a contract with another as an agent for a disclosed principal does not become a party to the contract and is not liable on the contract. *Id.* at § 320. However, if the agent of a disclosed principal makes an authorized contract with a third person, the liability of the principal depends upon the agreement between the agent and the other party. *Id.* at § 146.

Here, it is undisputed that Major Russell knew and agreed that:

1. the Air Force was required to authorize his initial application for the government travel card and then controlled whether his account was renewed, suspended or canceled by the card issuers;

2. the account would be canceled upon termination of his employment with the Air Force;

3. he could use the government card only for "official United States Government business" (Citicorp agreement) and "official travel and travel related expenses" (American Express agreement);

4. use of the government card for "personal purposes" was prohibited; and

5. he was personally liable for all charges made on the government cards.

Under these circumstances, as a matter of law, a principal-agent relationship existed between the Air Force and Russell, the Air Force was a disclosed principal, and pursuant to his contracts with the card issuers Russell, not the Air Force, was personally liable for the charges he incurred on the government cards.

The issue remains whether the Air Force was, under the RFPA, Russell's "authorized representative." I am mindful of the legislative intent of the RFPA to provide, statutorily, some limited right of privacy to individuals or partnerships with five or fewer individuals in their private financial transactions. I also consider Russell's role as agent of the Air Force in his use of the government cards.

■ Under specific agency principles, a "principal has the right to control the conduct of the agent" in matters entrusted to the agent, Restatement (Second) of Agency § 14, which right is "continuous and continues as long as the agency relation exists...." *Id.* at § 14, comment a. Thus, the role of "principal" encompasses reciprocal status of "authorized representative" of the "agent," at least to the extent of the matters entrusted to the agent by the principal. *See* Restatement (Second) of Agency, § 14, comment b.

■ My consideration of the language of the RFPA, its legislative history, settled agency principles, and the contracts underlying issuance of the government cards leads me to conclude, as a matter of law, that the Air Force was Russell's "authorized representative" as contemplated by the RFPA. As Russell's "authorized representative," the Air Force was a "customer" as defined by the RFPA. As a "customer," the Air Force defendants were entitled to the financial information they obtained from American Express and Citicorp.

■ It is axiomatic that a statute will not be construed so as to yield an absurd result. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982); *Turner v. Davis, Gillenwater & Lynch*, 4 F.3d 1556, 1564 (10th Cir.1993). To construe the RFPA as Russell would have me construe it would lead to the absurd result that a government employee could, under the cloak of the RFPA, abuse the public fisc or worse with impunity. Congress could never have intended such a result. Consequently, I conclude there is not a substantial likelihood that Russell will prevail on his RFPA claim.

■ This statutory construction is in harmony with, although not controlled by, constitutional standards of privacy under the Fourth Amendment. Under this standard, the law will recognize as legitimate, a "subjective expectation of privacy" if the expectation is "one that society is prepared to recognize as 'reasonable.'" *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

Russell could not prevail under either prong of this test. Given the language of the agreements underlying issuance of the government cards coupled with Russell's agency relationship with the Air Force, Russell cannot credibly claim a subjective expectation of privacy in the records. Even if he could, taxpayer concern for the integrity of the public fisc undermines any claim that society would recognize as reasonable an expectation of privacy under the RFPA where Russell, as the agent and employee of the Air Force, was bound to use the government cards solely for travel related expenses incurred on government business.

### 3. Collecting a Debt

Air Force defendants also seek to justify disclosure to them of Russell's financial records incident to the financial institution's collection of a debt. 12 U.S.C. § 3403(d). I disagree.

It is undisputed that American Express sent the Air Force a 60–day delinquent list which included Russell's account. Master Sergeant Pio noticed and forwarded one or two of these delinquency notices to Russell's resource advisor. (Pio Testimony). In June, 1994, Pio called American Express and requested additional, more detailed financial information on Russell's account. In February, 1995, defendant Major Kurt Schuman, contacted Citicorp Diners Club and American Express and obtained further financial information on Russell's accounts. Schuman then drafted charges against plaintiff based on this information. (Schuman Declaration ¶ 5).

■ The RFPA provides a "debt collection" exception. 12 U.S.C. § 3403(d) states: [n]othing in this chapter shall preclude a financial institution, as an incident to . . . collecting on a debt owing either to the financial institution itself or in its role as a fiduciary, from providing copies of any financial record to any court or Government authority.

This subsection, written with the financial institution in mind, allows the financial institution to disclose financial records for the purpose of collecting a debt owed to it. § 3403(d) authorizes financial information to flow from the financial institution to government authorities which assist in the financial institution's collection of the debt owed to it.

The actions of American Express and Citicorp in notifying the Air Force of overdue accounts on the 60–day list seem consistent with collecting a debt. Thus, arguably, the information contained in the 60–day list is not subject to the RFPA. However, the actions and policy of the Air Force in response to the 60–day delinquent list belie their self-characterization as a "debt collector."

■ American Express and Citicorp never formally requested the Air Force's assistance in collecting Russell's debts to them. Indeed, it is undisputed that the financial institutions engaged the services of a third-party civilian debt collection agency to collect from Russell. (TRO Exh. C and E). Also, Air Force guidelines for dealing with bad debts and financial responsibility include the following instructions:

Members are individually responsible

—as a general rule, Air Force does not have legal authority to require members . . . to pay personal debts

—debt enforcement is a civil matter (do not "take sides" particularly when legal issues arise as to the validity of the debt)

. . . . .

Commanders should not act as debt collectors

—do not admit or imply liability of a member in responding to complaints

—do not divulge that administrative or disciplinary action will be taken

—do not act as an intermediary for any party

(Pltfs. Exh. 2, Military Commander's Deskbook p. 11–53).

These guidelines further undermine Air Force defendants' claim that they were acting in the role of a "debt collector." Thus, I find and conclude that the Air Force was not acting as a "debt collector" under the RFPA in obtaining Russell's financial records.

Having decided that Russell has not shown clearly that he has a substantial likelihood of success on the merits, I need not address the remaining factors set forth in *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir.1991). *Mitel, Inc. v. Iqtel, Inc.*, 896 F.Supp. 1050, 1057 (D.Colo.1995). Even if I were to address those factors at length, I could not find and conclude that Russell has met his burden.

Accordingly, it is ORDERED that plaintiff Russell's motion for preliminary injunction is DENIED.